IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01398-PAB-KLM

GENERAL STEEL DOMESTIC SALES, LLC, d/b/a GENERAL STEEL CORPORATION,
A Colorado limited liability company,

      Plaintiff,

v.

ETHAN DANIEL CHUMLEY, individually, and
ATLANTIC BUILDING SYSTEMS, LLC, a Delaware corporation, d/b/a ARMSTRONG
STEEL CORPORATION,

      Defendants.

---

## GENERAL STEEL'S MOTION FOR SANCTIONS DUE TO SPOLIATION OF EVIDENCE AND DISCOVERY ABUSE

---

Plaintiff General Steel Domestic Sales, LLC, by its attorneys, hereby submits this Motion for Sanctions Due to Spoliation of Evidence and Discovery Abuse.

## I.  <u>INTRODUCTION</u>

A five-day jury trial is set in this case to begin on Monday, May 14, 2012.  Late on March 8, 2012, Plaintiff's CEO Jeffrey Knight was contacted by David Nardozzi, the former General Sales Manager for Defendants.  Mr. Nardozzi called not only to inform Mr. Knight about the illegal and deceptive sales practices of Defendants, but also to reveal that he had observed Defendants conducting an extensive document review last year during the discovery period in this case and removing the incriminating documents from their production set.

This first-hand account of Defendants' spoliation confirmed Plaintiff's belief that Defendants had provided sanitized document productions in this case – dumping large amounts

of immaterial and unsorted documents on Plaintiff that had been scrubbed of the incriminating

documentary evidence that had been vigorously sought by Plaintiff in discovery for over a year.

The spoliation brought before the Court in this Motion is part of Defendants' pattern of

systemic discovery abuse in this matter, which also includes perjured Rule 30(b)(6) testimony

provided by Defendants in August 2011.  Mr. Nardozzi testified that right after the August 2011

depositions, Defendant Ethan Chumley and his Vice-President Eric Beavers were laughing about

their depositions, claiming to have testified by "saying whatever they liked" and that they had

"lied under oath hundreds of times."  Affidavit of David Nardozzi at ¶ 8, **Exhibit 1** hereto.  The

deposition transcript itself reflects that Ethan Chumley and Eric Beavers testified at the

Defendants' Rule 30(b)(6) deposition in response to *115* questions that they "did not recall" or

did not remember" or "did not know" and Defendant Chumley, the designee on 15 of the 16

topics of questioning, testified that he'd done nothing to prepare for the deposition, but "at least

he did show up."  See, **Exhibit 2** hereto, Excerpts from Rule 30(b)(6) Deposition of Defendant

Armstrong Steel.

Further, as the Court is aware, these Defendants have fought discovery efforts at every

step of the way, repeatedly being ordered by this Court to respond to Plaintiff's discovery.  See,

Orders, **Exhibit 3** hereto.  The spoliation and egregious cover-up by these Defendants warrants

extreme sanctions under applicable law as set forth below.

## II.  <u>FACTUAL BACKGROUND</u>

Plaintiff's claims in this case are rooted in Defendants' false advertising and deceptive

sales practices.  Plaintiff alleges that Defendants have violated, *inter alia*, the Colorado

Consumer Protection Act, by their misleading the public and their customers in regard to

virtually every aspect of the sales process, from pre-sale material lies where they induce customers by pretending to be a large manufacturer with their own plants, and lies about pricing and what the customer will get for the contract price, to post-contract perpetuation of these lies, and other lies to bilk the public out of millions of dollars.

Since the beginning of this case, Plaintiff has been seeking production of Defendants' emails with their customers and potential customers concerning pre-contract inducements and representations, and post-contract communications relating to these deceptive and false practices and advertising, including the customer's complaints. Despite Plaintiff's exhaustive efforts, however, Defendants have produced boxes of immaterial matter, while failing to disclose the inculpatory evidence Plaintiff has since learned of by other means.

This suit was filed by Plaintiff on June 16, 2010. On June 22, 2010, Plaintiff's counsel sent a document preservation letter to Defendants' counsel. See, D. Fein June 22, 2010 Letter to P. Lemire and M. Baird, **Exhibit 4** hereto. Defendants' former employees who have testified in this case were unaware of the lawsuit and any document preservation obligation. See, § 2(D) below.

In response to Plaintiff's first document request, Defendants made available 6 bankers boxes of un-labeled documents at the offices of Defendants' counsel. See, Affidavit of David Fein, **Exhibit 5** hereto. The undersigned conducted the document review on December 1, 2010. *Id.* at ¶ 6. The production was represented to include the complete customer files of Armstrong Steel (2 boxes) and the complete customer quote request/leads files (4 boxes). *Id.* At the conclusion of that document review on December 1, 2010, Defendants' counsel informed the undersigned that Defendants had additional responsive emails relating to the customer files. *Id.*

at ¶ 7.   In the December 1, 2010, production of 6 boxes, there were no pre-sale or post-sale

customer communications or emails produced.  *Id*. at ¶ 6.  Instead, there were boxes containing

thousands of pages of blandly standardized, immaterial quote request/leads form documents that

Defendants printed out identifying potential customer leads.  *Id*.  The documents were not bates

labeled or controlled by Defendants in any manner.  *Id.*  The boxes were left on a conference

table for Plaintiff's counsel to waste hours reviewing.  *Id.*

On December 7, 2010, in response to Plaintiff's follow-up request to obtain Defendants'

responsive emails, Defendants' counsel Jacob Paul wrote in an email that "I've contacted our

client concerning his review of his email files and he is still in the process of searching through

them. I will let you know as soon as we have more documents to produce."  See, Jacob Paul

email dated December 7, 2010, **Exhibit 1 to Fein Affidavit** hereto.  On December 13, 2010, the

undersigned sent Defendants' counsel a letter addressing this issue of the non-production of

emails. See, D. Fein Letter dated December 13, 2010 **Exhibit 6** hereto.  On December 22, 2010,

<u>Defendants' counsel wrote back and said that Defendants had searched their email and found</u>

<u>nothing responsive</u>.   See, P. Lemire Letter dated December 22, 2010, **Exhibit 7** hereto.  At that

point, Plaintiff relied upon Defendants' counsel's claim that Defendants had no responsive

emails relating to communications with their customers and potential customers.

Thereafter, in March 2011, contrary to Defendants' representations, several former

employees of Armstrong Steel testified at their depositions in this case that they communicated

with Defendants' customers by email as their routine business practice.  It was apparent that each

stage of the sales process was transacted through Defendants' email communications with its

customers, yet Defendants repeatedly represented that they had no responsive emails to produce.

On May 25, 2011, Plaintiff sent a letter to Defendants requesting that they supplement their written discovery responses to Plaintiff by June 15. See, May 25, 2011 Letter from D. Fein to P. Lemire, **Exhibit 8** hereto.  Defendants responded by email on May 27 stating that they "should be able to supplement their discovery responses by June 15."  See, May 27, 2011 email from P. Lemire to D. Fein, **Exhibit 9** hereto.

On June 17, 2011, Plaintiff sent a follow up email to Defendants inquiring about the status of their supplemental discovery responses which Defendants agreed to provide by June 15. See, June 17, 2011 email from D. Fein to P. Lemire, **Exhibit 10** hereto.  On June 21, 2011, Defendants sent a response email to Plaintiff stating that they refused to supplement their discovery at this time contrary to their May 27 email.  See, June 21, 2011 email from P. Lemire to D. Fein, **Exhibit 11** hereto.

On June 23, 2011, a telephonic discovery hearing was held before Magistrate Judge Mix on Plaintiff's oral motion to compel supplementation of Defendants' responses to interrogatories and requests for production of documents.  The Court ordered Defendants to supplement their discovery responses in writing by July 14, 2011.  See, June 23, 2011 Minute Order, CM-ECF Document # 78, **Exh. 3**.

On July 14, 2011, Defendants served Plaintiff with an additional document production claiming these documents were supplemented responses to Plaintiff's First Requests for the Production of Documents to Defendants and Plaintiff's Interrogatories, Requests for Admission and Request for the Production of Documents to Defendants.  See, July 14, 2011 Letter from P. Lemire to D. Fein, **Exhibit 12** hereto.

On July 18, 2011, Plaintiff sent Defendants' counsel a letter describing the history of

Plaintiff's efforts to obtain Defendants' responsive e-mails and documents and also identifying

Defendants failure to produce extensive emails and attachments that should have been produced

with their customer files/communications.   See, D. Fein July 18, 2011 Letter to Peter Lemire,

**Exhibit 13** hereto. On July 21, 2011, Defendants' counsel responded to the undersigned's July

18, 2011 letter regarding non-production of Defendants' responsive emails.  See, P. Lemire

Letter dated July 22, 2011 to David Fein, **Exhibit 14** hereto.  Mr. Lemire's letter stated that:

> Defendants agree to supplement their responses.  In particular, on or about August
> 1, 2011 **Defendants agree to produce pre-sales emails sent between
> Armstrong and potential customers and e-mail correspondence between
> Armstrong sales staff and customers during the sales process.**

It was critical that Plaintiff obtain these documents because the discovery cutoff was

September 1, 2011, and Defendants were to be deposed on August 16, 17, and 18, 2011.  On

August 10, 2011, Mr. Lemire wrote another letter to the undersigned reiterating in key part that

"[S]pecifically, **Plaintiff has already requested all communications between Armstrong

Steel and its customers, which will be made available for your review on August 10th**."  See,

P. Lemire Letter dated August 9, 2011, **Exhibit 15** hereto.

On August 16, 2011, Plaintiff's counsel (attorney Paul Vorndran) conducted this

supplemental document production at the offices of Defendants' counsel.  That inspection was

repeated on September 6, 2011, by Plaintiff's counsel Patrick Frye.  The Defendants produced 3

additional boxes of un-labeled papers.  But whoever had prepared these document productions

had taken great care to remove incriminating records.  See, Affidavit of Patrick Frye, filed as

**Exhibit 16** hereto.

August 16, 2011, was the deposition of Defendants' Vice-President, Eric Beavers.

August 18, 2011, was the deposition of Defendant Ethan Chumley.  The Rule 30(b)(6)

deposition of corporate Defendant Armstrong Steel was set for August 17, 2011.  Plaintiff had

identified by notice 16 specific topics of inquiry for this deposition.  See, Amended Notice of

Rule 30(b)(6) Deposition, **Exhibit 17** hereto.  Defendants had its Vice President Eric Beavers

testify regarding 6 of the topics and Defendant and owner Ethan Chumley was designated by

Defendants to testify regarding 15 of the 16 topics.  (Defendants had both of them testify on

several of the topics).  For at least *86* questions, Defendant Chumley answered that he did not

recall or did not remember or did not know.  See, Excerpts from Rule 30(b)(6) Deposition

Testimony, **Exhibit 2** hereto.  Eric Beavers testified that he did not recall or did not know *29*

times. **Exh. 2**.  At one point, after repeatedly answering questions that he "did not recall",

Defendant Chumley testified as follows:

> Q.  Did you do anything to educate yourself on the topics of the 30(b)(6)
>      deposition today?
> A.  No.  But I did show up.
> Q.  So your answer is, no, you didn't do anything to educate yourself other
>      than what's in your head?
> A.  Correct.
> Q.  And for most of the questions I've asked now, you don't recall?
> A.  Correct.

Rule 30(b)(6) Deposition at 132: 2-10, **Exhibit 18** hereto.

### A. *Defendants' Former Sales Manager Has Now Come Forward and Testified About Defendants' Spoliation and Egregious Discovery Abuses*

David Nardozzi was hired by Defendants as their Sales Manager and he worked for

Defendants from February 13 or 14, 2011 until February 11, 2012.  Nardozzi Deposition at 6:8-

20; 59:9-14, **Exhibit 19** hereto. Mr. Nardozzi testified that he was not instructed of any

obligation to not destroy company documents or sales scripts until August 2011, around six

months after he began his employment.  Nardozzi Deposition at 19:21-20:11.  Mr. Nardozzi

testified that in August 2011, Ethan Chumley went out on the sales floor and told the sales

people that they weren't supposed to be deleting their emails, but then Defendant Chumley

winked at them and said if he didn't know about it, nobody knows about it, or words to that

effect.  Nardozzi Deposition at 40:19-41:25; 160:9-16; 165:18-166:3, **Exh. 19**.

 Mr. Nardozzi testified that at the time when Armstrong Steel was working on its

document production for General Steel, he saw Ethan Chumley going to each sales person's desk

and removing the sales scripts and throwing them away.  Nardozzi Deposition at 27:17-28:25,

**Exh. 19**.  Mr. Nardozzi testified that Defendants had been going desk to desk and throwing away

the sales scripts every couple of months last year.  Nardozzi Deposition at 28:17-25, **Exh. 19**.

Each sales person had special notes pertinent to this case on their scripts that were thrown away

by Defendants.  Nardozzi Deposition at 171:23-172:8, **Exh. 19**.

 In addition to scripts, Plaintiff had asked for production of email, because Armstrong

Steel regularly dealt with its customers by email.  Nardozzi deposition at 29:8-14.  Mr. Nardozzi

testified as follows in deposition:

> **Q. (BY MR. FEIN) So tell me about this reviewing e-mails. When did that occur approximately?**
> A. That was after one of the administrative assistants, whether it was Linda or Nicole, and I know it was a group effort for them, were printing all the sales guys' -- all the company e-mails.
> **Q. So do you recall approximately when this was in your year?**
> A. I think it was in August.
> **Q. August of last summer, 2011?**
> A. Yeah, it was definitely summer.
> **Q. What do you recall about -- you said Linda?**
> A. Yeah.
> **Q. What do you recall Linda doing?**

A. They were just instructed to -- what they would do is they would tell the sales guy, hey, your e-mail is going to be down for half an hour and then they would log into their e-mail and they would print off all their correspondence. I don't know if it was just sent mail or just their in-box, but I know they were supposed to print all their correspondence. Once they printed that, they would take it to Mr. Chumley.

**Q. So that was Linda and someone else?**

A. Yeah, Nicole. She was helping.

**Q. So they were going -- what, was there a computer on each salesperson's desk?**

A. Yeah, pretty much for the most part, unless you were a new guy and didn't have one or whatnot, but everybody had a computer.

**Q. So those were the computers that you were talking about that Linda and Nicole were going through?**

A. No, they didn't specifically go there. They could log into their e-mail remotely from their station and they could print them from there.

**Q. I see. Was there a network at Armstrong?**

A. No, it's just they use gmail for their e-mail services.

**Q. Okay. So Linda and Nicole were logging into each salesperson's e-mail account?**

A. Yeah.

**Q. And how were you aware of this?**

A. They told me. I was one of the guys, so they had to come to me and say, hey, we need your e-mail for 20, 30 minutes, you know, we need to go through it and print it. Everybody was well aware of what was going on.

**Q. So what was your understanding, that they were printing all of your e-mails?**

A. Yeah, they needed to print all of our e-mails so that they could turn them over to you guys.

**Q. And then do you know what happened from there?**

A. You know, Mr. Chumley and Mr. Beavers were behind closed doors for the majority of the next three to four days just reviewing each e-mail one by one.

**Q. How do you know that?**

A. Because it was my job to keep Ethan informed about what was happening on the sales floor. So periodically throughout the day, I would go back and let him know what was going on and I could watch him reading and reviewing all the e-mails.

**Q. By "him," you mean Ethan?**

A. Yes.

**Q. And Mr. Beavers?**

A. Yes.

**Q. Did you observe them -- and this was in Mr. Chumley's office?**

A. Right.

**Q. And they were in there for most or all of these three or four days?**

A. Yeah.

MR. GRANT: Object to the form.

A. Eric had other responsibilities, but it was Ethan's main thing. Eric would go help him, you know, from what I observed, when he had time, but -- which was -- you know, it was a top priority for those guys at that point.

**Q. (BY MR. FEIN) Did you see how many e-mails there were approximately?**

A. I don't know what the proper term is. I don't know if it's a ream. But when you're talking about a box of, what, 8 to 10 of those reams of paper, it was probably 5 or 6 of those.

**Q. You mean a box like a Bankers Box?**

A. Yeah, like a box. Like the box they gave me when they told me to get the hell out of there, you know.

**Q. So a regular kind of Bankers Box. You said there was about 8 to 10 of those?**

A. When you go to Office Max and you buy a box of paper. I don't know what the proper terminology is.

**Q. A box of paper, we'll call it.**

A. Cool.

**Q. So you saw how many of those boxes of paper?**

A. About five or six.

**Q. And that was in Mr. Chumley's office?**

A. Yeah.

**Q. That's what you observed him going through page by page?**

A. Yes.

**Q. Did you observe Mr. Chumley or Mr. Beavers doing anything with those e-mails?**

A. They were just going through them and determining what was -- you know, what was -- basically, reviewing everything. That's how we found out about some of the guys sending ridiculous e-mails to customers. We found the e-mails from a gentleman named Orlando Conroy or Conray, just basically appalling from a business perspective when speaking to a customer. We found tons of stuff like that. That's how we became really aware of what some of the sales guys were doing. So that's what they were doing initially.

**Q. So you said, "we found tons of stuff like that." Were they sharing these e-mails with you?**

A. Yeah, yeah. They would call the employee in the office and I would get reamed out for not knowing what they were sending in their e-mails and, you know, they would also get the same thing for sending, you know, bogus information.

**Q. So that was occurring all during this three- or four-day period?**

A. Yeah, absolutely.

**Q. You were being called in frequently with the salespeople?**

MR. GRANT: Object to the form.

A. Yeah, I mean, a minimum of once a day over those couple days for big stuff. You know, one day it was two or three times.

**Q. (BY MR. FEIN) So they'd sit you down with the salesperson?**

A. Yeah, and they'd slide the paper across the desk and say, what the heck is this, what are you telling customers this for, you can't be doing that.

**Q. Do you know what was done with those e-mails?**

A. After that, I didn't -- I mean, I didn't see them after that.

**Q. Did you see any of those e-mails getting thrown away?**

A. Well, there was an instance that Sunday before I think everything was due Monday morning or Tuesday morning that I went into the office unannounced. I went upstairs and Mr. Beavers – they had the door locked because it was after hours and Mr. Beavers was kind enough to let me in. I went back in Ethan's office and Eric and Ethan were sitting there reviewing the last stack of e-mails. So at this point, there were stacks a foot high around half of Ethan's office and they were reviewing the last 12 inches of paper between the two of them. At that point, you know, Mr. Chumley looks at this and goes, well, this isn't going to work. I didn't know what it said on it, but he slid it to Mr. Beavers and Mr. Beavers crumbled it up and shot it in the trash can.

**Q. Then what did you do?**

A. I just sit -- I was sitting Indian style on the floor just -- you know, just doing what I do. I wasn't a part of it. I wasn't made to be a part of, you know, the whole process. They finished – they said they completed -- probably about 45 minutes after I got there they were done. We all left at the same time.

Nardozzi Deposition at 30:19-37:13, **Exhibit 19**.

**Q. Mr. Nardozzi, back to when Mr. Beavers and Mr. Chumley were going through all these documents in August, did they tell you why they were going through all these documents personally page by page?**

A. Well, the only reason I went in there on a Sunday was because, you know, having no contact with anybody else, I wanted to see my buddies. Mr. Chumley had told me before that weekend that he would be in the office going through what -- going through e-mails to determine what he was going to be giving to General Steel and what he was not going to be giving to General Steel. I simply stopped there on a Sunday because I had nothing else to do and wanted to see the progress of that.

Nardozzi Deposition at 266:10-23, **Exhibit 19**.

**Q. The customers who complained about sales practices, did you see these complaints in writing, like e-mails, letters?**

A. You know, a few of them, yes, not the majority of them. Mr. Beavers dealt with like the Better Business Bureau for the company. I would see some here and there. A lot of times -- not a lot of times. A few times, I would be carbon copied

or I'd have customers reach out to me because they'd try to go through Mr.
Beavers, that wouldn't work; they'd try to go through their project manager, that
wouldn't work. Basically, they'd be spaming anybody down to the secretaries with
an e-mail saying, this is bogus, this is not -- you know, this is not what I signed up
for basically.
**Q. Would you see very many of these e-mails?**
A. If I saw one, it was too many. But I definitely saw -- I've definitely seen a
number of them. Whether they'd come to me directly or, you know, one of my
sales guys would say, look what's happening on this job, look what's happening
on this job, look at the e-mail on this, listen to this voice mail. That was a daily
basis, that was a daily thing.

Nardozzi Deposition at 74:15-75:13, **Exhibit 19**.

**Q. Did Mr. Beavers tell you something about the list that he gave to the
Attorney General?**
A. Yeah, he said that they were doctored.
**Q. I'm sorry. I don't know if she got the question. Did Mr. Beavers tell you
something about a list that he gave to the Attorney General?**
A. Yeah, they said that they were doctored. They said that they made it look like
they had delivered just about every building that they had, that they had taken an
order on.

Nardozzi Deposition at 81:1-10, **Exhibit 19**.

**Q. Now, did you talk to -- do you recall talking to Mr. Chumley and Mr.
Beavers after a deposition in this lawsuit last summer?**
A. Yeah, I'm not -- I think Mr. Beavers and Mr. Chumley were deposed on
different days. I remember Mr. Chumley coming back from his deposition, I
believe it was here -- and the reason I remember that is because he was actually
dressed up nice that day. We -- Eric and Ethan kind of converged in his office. It
was the end of the day and he swung back. We were all just kind of talking at this
point back in where our detailers sat. We were just kind of discussing the day's
events and Ethan was basically just saying, you know, he had said whatever he
wanted to say. And then we all went outside and we were having a cigarette. Me
and Ethan were out there and we were kind of discussing the day's events and he
was letting me know -- he told me that you guys – excuse me, that General Steel
had reached out to him and said -- or through an attorney and said to him that you
gentlemen would like to have a beer and settle this whole thing and squash it. At
that point, Mr. Beavers came out of the office and said -- you know, he pleaded
with Mr. Chumley. He said, look, this lawsuit is costing you 10 to 15K a month,
we could use that money towards the company. You know, if we can take down
generalsteelscam.com, that's what they want, if you take that down, we can be
done with this lawsuit. Ethan said, you know, this has been my dream to depose

Jeff Knight and -- I guess it must have been a day or so before Mr. Knight had to
give his deposition. And he goes, I've waited a year for this and I've spent 150
grand and, you know what, we just got that deal last week that had 80,000 profit
on it and I know that I can continue to fight this lawsuit, so I'm going to go with
it. Mr. Beavers was pretty upset. I didn't have a real opinion. I told him, I said,
you know, whatever you do, it's your company. That's where we left it.

**Q. Do you recall Mr. Beavers or Mr. Chumley telling you about lying under
oath?**

MR. GRANT: And I'm going to object. David, again, I don't see that as one of the
categories you're allowed --

MR. FEIN: It relates directly to spoliation of evidence and document discovery
abuse.

MR. GRANT: Discovery abuse is not one of the subjects.

MR. FEIN: It relates to spoliation.
Lying is spoliation. Let's continue.

MR. GRANT: It doesn't relate directly.
Perhaps there's some indirect relation, but there's no direct relation, so you're
getting into areas you're not supposed to be covering in this deposition.

**Q. (BY MR. FEIN) You can answer the question.**

A. Can you say it one more time, please?

**Q. Do you recall Mr. Beavers or Mr. Chumley telling you that they lied
under oath?**

A. Yeah, multiple times before this instance. They're saying that they'd say
whatever they needed to say and that -- you know, whatever it took is what they
said. He said he answered questions however he wanted to. I don't know what
questions they answered or whatnot, but I just know that, you know, they didn't
take it seriously.

Nardozzi Deposition at 42:1-44:17, **Exhibit 19**.

Mr. Nardozzi also signed an Affidavit in this case. See, David Nardozzi Affidavit,

**Exhibit 1** hereto, which he testified was true and correct. Nardozzi Deposition at 161:16-25,

**Exh. 19**. Mr. Nardozzi attests that he spoke with Ethan Chumley and Eric Beavers after they

returned from depositions in the General Steel case in August 2011, and they were laughing and

telling him that they had testified by saying whatever they had felt like, and that they had lied

under oath hundreds of times. Nardozzi Affidavit at ¶ 8, **Exhibit 1**. Defendants have made a

mockery of this case and our federal judicial system.

**B.** ***Defendants' Customers Have Provided Examples of the Type of Incriminating
Documents Withheld in Production By Defendants***

During trial preparation, Plaintiff contacted a number of Defendants' customers. Almost

all of Defendants' customers are very upset with their transaction with Defendants and believe

that they were ripped off by Defendants. A handful of Defendants' customers have now

provided Plaintiff with copies of emails that they exchanged with Defendants during the course

of their transactions. These emails exemplify exactly the type of incriminating emails that

Defendants removed from their document productions in this case. It is apparent that Defendants

have (or had) many, <u>if not hundreds or more</u>, of incriminating emails that were willfully withheld

from their sham document production. Examples of such emails are set forth in **Exhibit 20**

hereto and shown below:

GS 01131 - **From:** Mike Geheb
**To:** Big Street Construction, Inc
**Subject:** Re: NEWEST FINAL QUOTE
**Date:** Wednesday, May 25, 2011 7:38:23 AM
Hey Brian,
This building is Priced F.O.B. to the Port of Seattle. <u>It will be fabricated in our plant in Atwater
California</u>, then shipped to the Port Of Seattle for you, that has already been priced in for you.

   [*As part of its case, Plaintiffs intend to show that Defendants had no plants, and that*

   *Defendants made contrary representations as part of their consumer deception and false*

   *advertising.*]

GS 01134 - **From:** Eric Beavers
**To:** Big Street Construction, Inc
**Subject:** Re: Problems
**Date:** Friday, October 14, 2011 12:59:33 PM
My comments are below in red.
On Fri, Oct 14, 2011 at 1:55 PM, Big Street Construction, Inc
<brian@bigstreetconstruction.com> wrote:
Eric
<u>I was amazed to hear that the steel building was not fabricated by Armstrong. The</u>

14

salesman used this ploy as a selling point that Armstrong buildings are the best in
the business because they are made "in house." you and i discussed this in detail before the
building was even fabricated. ASC only details and engineers in house. You were not led to
believe that ASC was the fabricator of the building.

GS01148 - From: eric.beavers@armstrongbuildings.com

To: d_wenthold@hotmail.com
Date: Mon, 20 Sep 2010 15:09:40 -0700
Subject: Re: Drawings
David,
The March 15th Delivery date is not a typo or an error. I sent the email in regard to your delivery
date over a month ago. I am surprised that you are just now responding that that would be a
problem. The reason your building is scheduled to deliver March 2011 is because you were not
billed for freight, there are notes all over your file indicating that you mentioned the ability to
remain flexible on your deliver date. This is where we saved so much money on your project.
Also, we are in the heart of building season. Our production schedule is back logged nearly 16
weeks. I am glad that you received your plans, have you already pulled your building permit?
Eric Beavers
**Armstrong Steel Corp.**
www.armstrongbuildings.com
800.480.3045 [toll free]
805.248.7281 [direct line]
805.617.9247 [cell]
805.617.3042 [fax]
On Sep 17, 2010, at 6:01 PM, David Wenthold wrote:
I am going to assume that the March 15th delivery date as stated below was an error.
Plans are to start erecting by the fourth of October. Please let me know asap as to what to expect,
Dave

*[As part of its case, Plaintiffs intend to show that David Wenthold, like most of*

*Armstrong's customers, contracted for freight included in his price. Part of*

*Defendants' deceptive practices included emails like this one where Armstrong*

*told customers fictional stories about freight and delivery obligations. In this*

*case, of customer David Wenthold, Armstrong delayed his delivery by around 9*

*months and then charged him $28,576 extra for freight that was supposed to have*

*been included and for steel price increases.*

*Plaintiff also intends to show that Armstrong Steel former employee Leban Oday*

*recalls how Eric Beavers told him that the $28,576 added charge on this contract*

*was "100% profit."]*

GS01156 - From: **Ryan Sanders** <ryan.sanders@armstrongbuildings.com>

Date: Mon, Feb 15, 2010 at 11:45 AM
Subject: Shipping Changes
To: dealernetwork@armstrongbuildings.com
> Dear Dealer:
>
>
>>> This email is to inform all of you that we will be implementing some changes in regard to our shipping procedures. We will no longer be utilizing our own fleet to deliver buildings. After extensive analysis, maintenance and fuel costs appear to be the deciding factor. This change will translate to slightly higher prices for our customers, but because of the high volume coming from our dealer base, in the long run it will save our dealers quite a bit of money. ANY AND ALL shipments leaving after February 31, will incur a nominal fuel surcharge. As you all know, we were subject to an extremely large steel price increase in the last 30 days and briefly contemplated passing the increase along to our end users, but decided that maintaining healthy relationships with our dealers and end users is more important to Armstrong Steel Corporation than breaking even on a few hundred buildings. These changes are being implemented because we were having some orders delivering later than originally scheduled due to mechanical issues and union disagreements . In short, this will be good for everyone. If you have any questions, comments or concerns please feel free to contact me. I will be travelling on business for the next two weeks, but you can contact me through email.
Ryan Sanders VP Operations

[*As part of its case, Plaintiffs intend to show that this false email was sent to many*

*customers to rip them off for bogus "Fuel Surcharges" – there was no fuel*

*surcharge, no fleet, and the customers had contracted for freight included*]

GS01157 -
From: Jim p, Remington Upremington@arrnstrongbuildings.com]
Thursday, December 24,200912:38 PM
dealernetwork@armstrongbuildings.com
Subject:
> Dear Dealer:
>
>

Shipping Changes

>> This email is to inform all of you that we will be implementing some changes in regard
to our shipping procedures. We will no longer be utilizing our own fleet to deliver'
buildings.  After extensive analysis, maintenance and fuel costs appear to be the deciding
factor. This change will translate to slightly higher prices for our customers, but
because of the high volume coming from our dealer base, in the long run it will save 'our
dealers quite a bit of money. ANY AND ALL shipments leaving after December 31, will incur
a nominal fuel surcharge. As you all know, we were subject to an extremely large steel
price increase in the last 30 days and briefly contemplated passing the increase along to
our end users, but decided that maintaining healthy relationships with our dealers and end
users is more important to Armstrong Steel Corporation than breaking even on a few hundred
buildings. These changes are being implemented because we were having some orders
delivering later than originally scheduled due to mechanical issues and union
disagreements . In short this will be good for everyone. If you have any questions,
comments or concerns please feel free to contact me. I will be travelling on business for
the next two weeks, you can contact me through email.

Jim P. Remington III

VP International Affairs

 Armstrong Steel Building Corp

GS 01158-59 are further emails from this customer (David Casady) and Armstrong Steel with

more lies in response to the customer's complaints.

GS01160 is a copy of a court judgment for treble damages against Armstrong Steel.  This was

not produced.  GS 01161 is an email with more false stories regarding the fuel surcharge and

pseudonyms used as part of Armstrong Steel's scam racket.

GS01162 is a copy of Armstrong Steel's invoice for the $3,876 bogus fuel surcharge to customer

David Casady.  This document was not contained in Armstrong Steel's production of a sanitized

"customer file" for David Casady.  It appears that most or all of the 273 customer files produced

by Defendants were similarly sanitized to not include incriminating documents.

        Based on its own investigation alone, Plaintiff General Steel has received documents

from a handful of Armstrong Steel customers that were never produced by Armstrong itself.  It is

not happenstance that they provided incriminating emails and document evidence yet such

emails and documents were not in Defendants' production.  From this, it is plain that Defendants

were careful to excise material from their document productions.  And according to their former

General Sales Manager David Nardozzi, that is exactly what they did when they spent days in

Ethan Chumley's office doing.

### C. *Defendants Selectively Produced their "Sales Scripts" and Threw Out the Bad Ones*

Plaintiff requested in its First Request for Production of Documents that Defendants

produce their written sales scripts.  See, **Exhibit 21** at document request no. 4.  Defendants'

originally produced only 5 pages totaling 3 scripts.  See, **Exhibit 22**.  Their employees, however,

testified that these written sales scripts changed on a daily basis and that there were many.  See,

Ted Zounis Depo. at 85:8-21, Jon Abbotts Depo. at 112:14-25, 175:15-19, Katherine Swire

Depo. at 12:4-8, David Treece Depo. at 9:8-21, David Nardozzi Depo. at 15:4-10, **Exhibit 23**.

During a telephonic discovery hearing in this case before Magistrate Judge Mix, the issue of non-

production of Defendants sales scripts was raised by Plaintiff's counsel, and Defendants' counsel

stated that the reason for only a few scripts being produced was because Defendants would

"overwrite" the Word document on their computers and they hadn't saved historical versions.

Eight months later in the litigation, after being ordered to supplement their discovery responses,

Defendants' produced 2 additional scripts (Armstrong document nos. 4929-32) but their

production, by all accounts, was sanitized.  Defendants' former General Sales Manager, David

Nardozzi now sheds light on this issue, testifying about how Ethan Chumley went through the

offices of Armstrong Steel taking the annotated written scripts off of each sales person's desk

and throwing them in the trash so they would not be produced to Plaintiff General Steel.

**D.** ***Defendants' Employees Were Never Notified of this Lawsuit or Any Document Preservation Obligation***

This suit was filed on June 16, 2010. Ted Zounis worked for Defendants from October 2009 until September 2010. From June 2010 to September 2010, Mr. Zounis was the General Sales Manager for Defendants. Ted Zounis Depo. at 43:19-24, **Exhibit 24** hereto.

Mr. Zounis testified that he was never informed that there was a lawsuit going on and that employees had a document preservation obligation. Ted Zounis Depo. at 80:24-81:11, **Exhibit 24**. Former employee Jeff Rhodes worked at Armstrong from June 7, 2010 to July 7, 2010 and he testified that he was not made aware of any lawsuit or document preservation obligation. Jeff Rhodes Deposition at 24:16-25:3, **Exhibit 25** hereto. Former employee Kate Swire worked at Armstrong from May 6, 2010 to June 29, 2010 and she also testified that she was not made aware of any lawsuit. Kate Swire Deposition at 20:18-21, **Exhibit 26** hereto. Former employee David Treece worked at Armstrong from September 13, 2010 to October 6, 2010 and he testified that he was not made aware of any lawsuit or document preservation obligation. David Treece Deposition at 48:16-19; 51:17-20, **Exhibit 27** hereto.

## III. ARGUMENT

In this case, Defendants Ethan Chumley and his company Armstrong Steel Corporation, have been caught red-handed in their willful spoliation. They have also made a mockery of this litigation and the judicial system as exemplified by their sham testimony at the crucial Rule 30(b)(6) deposition. Defendants' willful spoliation, combined with their flagrant discovery abuses, warrant extreme sanctions. Because of the breadth of the spoliation and the proximity of trial, nothing short of entry of a default judgment against them is a sufficient sanction.

A.  **Defendants' Willful Spoliation Warrants Extreme Sanctions**

Spoliation sanctions are proper when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009), citing, *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir.2007). In *McCargo v. Texas Roadhouse, Inc*., 09-CV-02889-WYD-KMT, 2011 WL 1638992 (D. Colo. May 2, 2011), Magistrate Judge Tafoya held in relevant part that the intentional destruction of relevant records—either paper or electronic—is clearly willful conduct. *Id.*, citing, *Philips Electronics N. America Corp. v. BC Technical,* —— F.Supp.2d ——, No. 2:08–cv–639 CW–SA, 2011 WL 677462, at *48 (D.Utah Feb. 16, 2011).  In *McCargo*, the court summarized the relevant standards relating to spoliation:

> Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *Blangsted v. Snowmass–Wildcat Fire Prot. Dist.,* 642 F.Supp.2d 1250, 1259–60 (D.Colo.2009) (quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473 F.3d 450, 457 (2d Cir.2007)). A court has both inherent power as well as authority under Federal Rule of Civil Procedure 37(b)(2) to sanction a litigant for the destruction or loss of evidence. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–45 (1991); *Silvestri v. Gen. Motors Corp.,* 271 F .3d 583, 590 (4th Cir.2001); *Smith v. Nw. Fin. Acceptance, Inc.,* 129 F.3d 1408 (10th Cir.1997).
>
> In determining whether sanctions are appropriate [based on a claim of spoliation], the court must ... determine whether the missing documents or materials would be relevant to an issue at trial." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614, 621 (D.Colo.2007). Sanctions for spoliation of evidence are appropriate when (1) a party had a duty to preserve the evidence because it knew, or should have known, that litigation was imminent, and (2) the other party was prejudiced by the destruction of the evidence. *Turner v. Pub. Serv. Co. of Colo.,* 563 F.3d 1136, 1149 (10th Cir.2009). The burden is on the moving party to prove, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it. *See In re Krause,* 367 B.R. 740, 764 (D.Kan.2007).

"When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Blangsted,* 642 F.Supp.2d at 1260.

Defendants' degree of culpability is extreme, and the actual prejudice to Plaintiff is great. Defendants have flagrantly withheld, on a widespread basis, smoking-gun evidence in the form of email communications with their customers and prospective customers. At the same time, they positioned their counsel to assure Plaintiff that all such documents had been produced. Moreover, Defendants intentionally discarded their incriminating sales scripts so Plaintiff would not obtain them. Defendants have gone to great efforts to hide their deceptive practices but have now been exposed by their former Sales Manager who has come forward to disclose Defendants' spoliation.

Though Plaintiff has obtained from a few of Defendants' customers examples of the type of incriminating documents withheld or destroyed, the severe prejudice to Plaintiff is that Plaintiff can never know the extent to which Defendants withheld from production and/or destroyed large numbers of such documents that could have been put before the jury and the Court.

Citing *Philips*, Magistrate Judge Tafoya further stated that:

[S]poliation sanctions serve a dual function. Not only are they meant to penalize litigants, but they also serve to deter those who might be tempted to cause the spoliation of evidence. Lesser sanctions would not establish deterrence some litigants need regarding this behavior.... One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he ... is tempted to thus evade. In other words, courts have recognized that if parties are willing to take the risk and balance destroying evidence against turning over the proverbial smoking gun, knowing that the destruction will not result in the ultimate judgment,

destruction of important evidence will occur. The court must not inherently
reward the misbehavior of companies and individuals who want to destroy
incriminating evidence rather than produce it and have a judgment entered against
them; litigants must be strongly discouraged, rather than encouraged in any way,
to become more and more clever about how to delete and hide the destruction of
electronic documents.

*McCargo v. Texas Roadhouse, Inc.*, 09-CV-02889-WYD-KMT, 2011 WL 1638992 at *10 (D.

Colo. May 2, 2011); see also, *E.E.O.C. v. Dillon Companies, Inc.*, 09-CV-02237-RBJ-MEH,

2011 WL 5834648 (D. Colo. Nov. 21, 2011).

It is obvious that lesser sanctions would not establish deterrence for these incorrigible

Defendants.  This is the classic example of Defendants who are "willing to take the risk and

balance destroying evidence against turning over the proverbial smoking gun, knowing that the

destruction will not result in the ultimate judgment, destruction of important evidence will occur.

The Court must not inherently reward the misbehavior of companies and individuals who want to

destroy incriminating evidence rather than produce it and have a judgment entered against them.

Litigants must be strongly discouraged, rather than encouraged in any way, to become more and

more clever about how to delete and hide the destruction of electronic documents.

### B.  Defendants' Flagrant Discovery Abuses Warrant Extreme Sanctions

In *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920-21 (10th Cir. 1992), the court held that the

extreme sanction of dismissal [or default judgment] is permitted under Rule 37(b)(2)(C) of the

Federal Rules of Civil Procedure "[i]f a party ... fails to obey an order to provide or permit

discovery."  Determination of the correct sanction for a discovery violation is a fact-specific

inquiry that the district court is best qualified to make. *Id.*  Dismissal represents an extreme

sanction appropriate only in cases of willful misconduct. *Id.*, citing, *Meade v. Grubbs,* 841 F.2d

1512, 1520 (10th Cir.1988); *M.E.N. Co. v. Control Fluidics, Inc.,* 834 F.2d 869, 872-73 (10th

Cir.1987); *Standard Metals,* 817 F.2d at 628-29.  Before choosing dismissal as a just sanction, a

court should ordinarily consider a number of factors, including: "(1) the degree of actual

prejudice to the defendant; (2) the amount of interference with the judicial process; ... (3) the

culpability of the litigant," (4) whether the court warned the party in advance that dismissal of

the action would be a likely sanction for noncompliance, and (5) the efficacy of lesser sanctions.

*Ehrenhaus v. Reynolds*, 965 F.2d at 920-21 (internal citations omitted).

        In this case, Defendants' pattern of contumacious conduct warrants the most extreme

sanctions.  In addition to Defendants' spoliation, the sham Rule 30(b)(6) testimony of

Defendants' pretending that they did not recall or remember answers for many of the questions,

and then laughing about it afterwards.  As Defendants' former employee Jeff Rhodes testified in

this case, Defendants are desperate flimflam men who will do or say anything to take their

customers' money. See, **Exhibit 25**, Jeff Rhodes Deposition at 30:1-9; 57:9-58:4.  David

Nardozzi, their former Sales Manager, now confirms through his first-hand account that these

Defendants will also do and say anything, including lying under oath hundreds of times and then

laughing about it, to litigate this case while continuing their fraudulent business enterprise.

        Under the *Ehrenhaus* factors: (1) the degree of actual prejudice to the plaintiff is great.

Defendants not only withheld extensive incriminating documents, they then lied and made up

fairy tales at their depositions, and then laughed about it afterwards to their then General Sales

Manager; (2) Defendants have grossly interfered with the judicial process by their flagrant

contempt for telling the truth; (3) Defendants' culpability is extreme given their repeated

intentional discovery abuse and spoliation; (4) the court did not expressly warn Defendants in

advance that entry of default judgment might occur, but these Defendants certainly cannot feign

surprise that their extreme conduct would result in severe sanctions when caught red-handed –

Defendants were warned by the Court that future discovery disputes may involve imposition of

sanctions (see, e.g., Minute Order dated 6-23-2011, CM/ECF #78); (5) lesser sanctions would

not be effective because Defendants Chumley and Armstrong have shown utter disregard for the

truth and the federal judicial process.

The two most significant factors, Defendants' culpability and the prejudice to the

Plaintiff, are overwhelming here.  *Genova v. Banner Health*, 11-CV-01139-RBJ-MJW, 2012 WL

934246 (D. Colo. Mar. 20, 2012) ("When deciding whether to sanction a party for the spoliation

of evidence, courts have considered a variety of factors, two of which generally carry the most

weight: 1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the

degree of actual prejudice to the other party." *Id.* (quoting *Jordan F. Miller Corp. v. Mid–*

*Continent Aircraft Serv., Inc.,* 1998 WL 68879, *13 (10th Cir. Feb. 20, 1998) (unpublished)).

Documents that now rest in a landfill can never be retrieved; one cannot unscramble an

egg.  Mr. Nardozzi has revealed that Defendants will not produce deponents that take their

obligation to render truthful testimony seriously; there is no way to validate that a re-noticed

deposition will result in testimony any more truthful than the August 2011 depositions were.

And bluntly put, Defendants have been counting on precisely those impediments against

accessing the truth as a cornerstone of their defense.

    **C. <u>Upon Entry of Default Judgment, In the Court's Discretion, Plaintiff Requests
Entry of an Injunction in a Form to Be Submitted by Plaintiff, and a Hearing on
the Amount of Damages to Be Awarded to Plaintiff</u>**

By their default, Defendants are deemed to have admitted Plaintiff's allegations and

therefore Plaintiffs are entitled to an injunction as alleged in Plaintiff's Amended Complaint

(CM/ECF # 21) and its Seventh Claim for Relief for Injunction.  *Caroline Records v. Westhoff*, 04-CV-02393-WDM, 2006 WL 538688 (D. Colo. Jan. 25, 2006), citing, *Olcott v. Delaware Flood Co.,* 327 F.3d 1115, 1125 (10th Cir.2003) (quoting *Jackson v. FIE Corp.,* 302 F.3d 515, 525 (5th Cir.2002)).  Plaintiff therefore requests that the Court grant Plaintiff leave to file a form of Injunction for entry by the Court.

In addition, Plaintiff is seeking damages in this case against Defendants as alleged in Plaintiff's Amended Complaint.  Because the amount of damages is not liquidated, Plaintiff proposes that the Court hold a hearing to assess damages, perhaps utilizing the May 14, 2012 trial date already on the Court's docket, or such other date as the Court approves.  The Tenth Circuit has held that, "[the] court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation." *Hunt v. Inter–Glove Energy, Inc.* 770 F.2d 145, 148 (10th Cir.1985) (citing *Venable v. Haislip,* 721 F.2d 297, 300 (10th Cir.1983)).  *United States v. Fehrenbacher*, 10-CV-01290-WYD-MEH, 2011 WL 3156948 (D. Colo. July 7, 2011) report and recommendation adopted, 10-CV-01290-WYD-MEH, 2011 WL 3159132 (D. Colo. July 27, 2011); see also, *Mrs. Condies Salad Co., Inc. v. Colorado Blue Ribbon Foods, LLC*, 11-CV-02118-KLM, 2012 WL 872708 (D. Colo. Mar. 13, 2012)("When assessing damages, however, the Court must establish the amount that the moving party is entitled to recover. *Herzfeld v. Parker,* 100 F.R.D. 770, 773 (D.Colo.1984). Whether to conduct a hearing for the purpose of ascertaining damages is discretionary; the Court need not conduct a hearing "if the amount claimed is a liquidated sum or one capable of mathematical calculation." *Held v. Shelter Sys. Group Corp.,* No. 93–1225, 1994 WL 47157, at *1 (10th

Cir.1994) (unpublished) (citing *Hunt v. Inter–Globe Energy, Inc.,* 770 F.2d 145, 148 (10th

Cir.1985)").

## IV. CONCLUSION

For all of the reasons set forth above, Plaintiff respectfully requests that the Court

sanction Defendants for their gross spoliation and discovery abuses, as set forth herein.  Plaintiff

specifically requests entry of a default judgment against Defendants and in favor of Plaintiff on

all allegations and each of Plaintiff's Claims for Relief in its Amended Complaint (CM/ECF#21)

and for dismissal with prejudice of Defendants' Counterclaims against Plaintiff; for entry of an

Injunction in a form to be approved by the Court, and for entry of judgment on damages after a

hearing on damages.  Plaintiff also requests that the Court award Plaintiff all attorney's fees and

costs relating to this Motion and the discovery abuses described herein, and for such other and

further relief as the Court deems just and appropriate.

WHEREFORE, for all of the reasons set forth above, Plaintiff respectfully requests that

the Court sanction Defendants for their gross spoliation and discovery abuses, as set forth herein.

Plaintiff also requests that the Court award Plaintiff all attorney's fees and costs relating to this

Motion and the discovery abuses described herein, and for such other and further relief as the

Court deems just and appropriate.

### Certificate of Conference Under D.Colo. L.R. 7.1(A)

Plaintiff is quite aware that "the Court takes the duty to confer imposed by Rule 7.1A

*very seriously.*"  *Zimmerman v. The CIT Group, Inc*., 2008 WL 2945601 (D. Colo. July 28,

2008) (emphasis in the original).  This case's discovery process has entailed many Local Rule

7.1A exchanges, several conference calls with the presiding Magistrate Judge, and one in-person

hearing before the Magistrate Judge.  The undersigned respectfully submit that this activity has

failed to prevent the profound discovery abuse outlined in this Motion.  Nevertheless, the

undersigned sought Defendants' position on this Motion prior to its filing.  Defendants' counsel

indicate that this Motion will be opposed.

DATED:  March 30, 2012.                    /s/ David S. Fein
                                           David S. Fein, Reg. No. 18788
                                           Patrick D. Frye, Reg. No. 30369
                                           Building Services Group, LLC Legal Dept.
                                           10639 Bradford Road
                                           Littleton, CO 80127
                                           Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this document was filed and served via the Pacer/ECF System on the day of its filing with the Court upon the following:

Peter C. Lemire
Jacob W. Paul
Leyendecker & Lemire, LLC
9137 E. Mineral Circle, Suite 280
Centennial, CO 80112
Peter@coloradoiplaw.com
Jake@coloradoiplaw.com

Tiffaney A. Norton
Senter Goldfarb & Rice, L.L.C.
1700 Broadway, Suite 1700
Denver, CO 80290
Telephone: (303) 320-0509
Facsimile: (303) 320-0210
E-mail: tnorton@sgrllc.com

Paul M. Grant
Grant Kuhn LLC
143 Union Blvd., Ste. 550
Lakewood, CO 80228
pgrant@grantkuhnllc.com

                                           s/ Adam Walczak