IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01398-PAB-KLM

GENERAL STEEL DOMESTIC SALES, LLC,
d/b/a General Steel Corporation, a Colorado limited liability company,

      Plaintiff,

v.

ETHAN DANIEL CHUMLEY, individually, and
ATLANTIC BUILDING SYSTEMS, LLC, a Delaware corporation,
doing business as Armstrong Steel Corporation,

      Defendants.

---

## ORDER

---

      Plaintiff General Steel Domestic Sales, LLC, doing business as General Steel Corporation ("General Steel"), brings trademark, unfair advertising, and false advertising claims against defendant Atlantic Building Systems, LLC, doing business as Armstrong Steel Corporation ("Armstrong"), which is a competitor in the prefabricated steel building business, and defendant Ethan Daniel Chumley, who owns and runs Armstrong.  As relief for its claims, General Steel requests an injunction and disgorgement of profits.

      The Court has subject matter jurisdiction over plaintiff's trademark and false advertising claims pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over plaintiff's state law unfair competition claim pursuant to 28 U.S.C. § 1367(a).

      The Court presided over a trial to the court in this matter from July 9, 2012

through July 11, 2012.  Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

## A.   FINDINGS OF FACT

**1.**   General Steel has a registered trademark on its logo, consisting of the outline of a building with horizontal lines and the words "General Steel Corporation" incorporated within it, *see* Ex. 2, and also on the word mark "GENERAL STEEL CORPORATION."  *See* Ex. 1.[1]

**2.**   General Steel and Armstrong are in the business of selling prefabricated steel buildings directly to consumers.  The buildings range in size and purpose and can cost anywhere from $10,000 to $200,000.

**3.**   General Steel was founded by Jeffrey Knight in 1995.  Mr. Knight is General Steel's president.  Mr. Knight testified that in the mid-1990s there were no well-known brands in the industry, despite it being a multibillion dollar industry.  Starting in the late 1990s, Mr. Knight sought to achieve strong brand recognition for General Steel through radio advertisements aimed at directing consumers to the company's website.  Since that time, the company has spent over $50 million in marketing, with seventy to eighty percent of that amount devoted to radio advertisements.  At the peak of General Steel's radio advertising efforts, its advertisements reached 17 to 18 million people per week.

**4.**   Sometime in 2002, the Colorado Attorney General's Office began investigating General Steel and filed a civil complaint against it in 2004.  In December

---

[1] All citations to exhibits in this Order are to exhibits admitted at trial.

2004, a state court entered a permanent injunction against General Steel for violations of the Colorado Consumer Protection Act.  A few other adverse court decisions have since been entered against General Steel concerning consumer protection issues. These decisions are available to consumers online, as were other negative comments on websites predating defendant Chumley's activities.  Mr. Knight admitted that General Steel's sales peaked in 2002 and that it has experienced a steady decline in sales since then, including a decline in the years preceding the creation of Armstrong Steel.  Mr. Knight attributed the decline after 2002 to the case arising out of the Attorney General's complaint.

5.      Mr. Chumley began working as a salesperson for General Steel sometime in 2004.  He worked at General Steel for approximately 9 months.  The parties disagree over what led to his termination, but there is no dispute that he left as a disgruntled employee.

6.      After leaving General Steel, Mr. Chumley took a job with Olympia Steel ("Olympia"), a prefabricated steel building company in Pittsburgh, Pennsylvania.  While working at Olympia, Mr. Chumley sent an obscene email to numerous employees at General Steel under a pseudonym intended to mock certain General Steel employees against whom Mr. Chumley had a grudge.  *See* Ex. 24.  Furthermore, Mr. Chumley created or directed the creation of a website of gay pornography that he falsely attributed to an employee at General Steel.  Although Mr. Chumley contends that a co-worker at Olympia who had no connection with General Steel created this site without any involvement by Mr. Chumley, the Court finds Mr. Chumley's testimony to be

incredible on this point.

7.      At some point during his employment with Olympia, Mr. Chumley moved to Colorado to open an Olympia office.  He thereafter created defendant Atlantic Building Systems, LLC, which only later began doing business under the auspices of Armstrong Steel Corporation.  Armstrong sold its first building in April 2009.

8.      In his efforts to get Armstrong off the ground, Mr. Chumley engaged in an online advertising campaign through Google AdWords that targeted General Steel.  For example, as of December 22, 2009, Armstrong had the following sponsored advertisement on Google: "General Steel buildings – Steel framed buildings | Armstrong Steel ...  Checkout [sic] various Armstrong Steel buildings – Building frames for your general steel buildings like commercial steel buildings, industrial steel buildings. www.armstrongsteelbuildings.com/steel-metal-building-frames.php."  Ex. 3 at GS00077.

9.      Over the course of 2009 and 2010, Mr. Chumley was involved in the issuance of a number of internet press releases and internet articles that used false claims to publicize Armstrong's capabilities.  Some of those articles contained quotes by a fictional individual named J.P. Remington, III, V.P. of International Affairs for Armstrong Steel.  *See, e.g.*, Ex. 13 at 000123.  One such article falsely claimed that Armstrong established an "enrichment program . . . benefit[ting] the less fortunate children of the Middle East" by helping to rebuild schools in Iraq.  *See id.*  Armstrong also falsely claimed that, as of May 2010, it was required to "postpone international deliveries by one month to meet rising demand here in the U.S. for their steel buildings." Ex. 13 at 000131.

**10.** Emails purporting to be from J.P. Remington were sent to customers from Mr. Chumley's email address. *See* Ex. 41.

**11.** Although Mr. Chumley admits that much of the information in these articles was false, including their having been written by J.P. Remington, he denied any responsibility for the articles or the emails and instead blamed a former employee named Jon Abbotts for writing them. The Court does not find Mr. Chumley credible to the extent he contends that he was not involved or did not approve of these articles. Mr. Chumley forwarded emails purporting to be from J.P. Remington. Moreover, Mr. Chumley claims that he learned of Mr. Abbotts' activities late in 2009 or early 2010. Yet it is undisputed that Mr. Abbotts was not terminated until sometime in spring 2010.

**12.** On its website on February 1, 2010, Armstrong characterized itself as "one of the largest pre-engineered steel building manufacturers in North America." Ex. 12 at GS00080.[2] Armstrong's February 1, 2010 website also informed visitors that "Armstrong Steel is a leading manufacturer of pre-engineered steel buildings and conventional metal buildings for commercial, industrial and religious building projects." Ex. 12 at GS00080. The website described Armstrong as "the leader in metal buildings and steel metal buildings." Ex. 12 at GS00088. According to Mr. Chumley, Armstrong

---

[2] Mr. Chumley disputed whether Exhibit 12 was an accurate reflection of the website as of that date. That dispute, however, appeared to turn on its completeness. Mr. Chumley did not provide any basis to believe that the pages found in Exhibit 12, including the text in the "About Armstrong Steel Buildings" section of the website, were not from Armstrong's website as of February 1, 2010. The Court finds that, while the website as of that date likely consisted of many more pages, the pages in Exhibit 12 were prominent on the website, being the pages directly linked from the following links on Armstrong's home page: "About Armstrong," "Our Buildings," "Building Center." Ex. 12.

sold approximately seventy buildings from the time of its founding through April 2010.

13.    The February 1, 2010 webpage further stated that "[e]ach piece of steel we fabricate is representative of our experience, know-how and cutting-edge technology."  Ex. 12 at GS00083.  As of that date, Armstrong did not fabricate any steel.

14.    The February 1, 2010 website stated that Armstrong had an "onsite, environmentally-controlled painting facility" which "applies the finishing touches to every piece of your steel building structure without adding cost to your metal building project." Ex. 12 at GS00084.  It is undisputed that Armstrong did not have, and does not have, an on-site painting facility.  The website also included the claim that "[o]ur facilities utilize laser precision engineering."  Ex. 12 at GS00085.  There is no evidence that Armstrong has onsite facilities that utilize laser precision engineering.

15.    Upon searching for "general steel" in Google on February 27, 2010, an internet user would likely have seen Armstrong's sponsored advertisement reading "General Steel Buildings  www.ArmstrongSteelBuildings.com   Price Your Building Online Or Let Us Do It.  Guaranteed Lowest Prices!"  Ex. 3 at GS00118.

16.    In June 2010, Armstrong had an advertisement that read "General Steel Buildings  Price an Armstrong Steel Building Online in Minutes Or Let Us Do It. www.ArmstrongSteelBuildings.com."  Ex. 3 at GS00299.  As of June 11, 2010, when somebody entered the search term "General steel buildings" into Google, Armstrong had advertisements that read "Don't Buy General Steel Without Pricing Armstrong First. Price a Steel Building in Minutes! www.ArmstrongSteelBuildings.com," "Before You Buy

<u>General</u> Price Armstrong Steel First   Guaranteed Lower Prices!

www.ArmstrongSteelBuildings.com," and "<u>General Steel v Armstrong</u>

www.ArmstrongSteelBuildings.com   Don't Buy a General Steel Building Without Pricing

Armstrong First!"  Ex. 3 at GS00249, GS00255, GS00257

     **17.**    General Steel commenced this lawsuit on June 16, 2010.  *See* Docket No.

1.  On July 14, 2010, Mr. Chumley emailed his online marketing consultant that he

wished to expand the "General Steel" advertising campaign to the search engines Bing

and Yahoo because defendants were "in litigation over it" and "may as well maximize."

Ex. 7.  Sometime later that same summer, the search engine companies told Armstrong

to stop using "General Steel" in its advertising copy.

     **18.**    In August 2010, Armstrong began directing visitors to its home page to a

webpage entitled "May the Best Building Win."  Ex. 8 at GS00430.  Below that title, in

smaller letters, was the following: "Compare the Two Finest Buildings on the Market

Today and Let Reputation and Price Be the Deciding Factors!."  *Id.*  A visitor to the

page then saw General Steel's corporate logo on the left with Armstrong's corporate

logo on the right.  *See id.*  Listed underneath each logo were what purported to be

features or qualities of each company and their respective product.  *See id.*  Armstrong

contended that both companies had a "50 year warranty," "Purlin Bearing Rib (PBR)

ROOF & WALLS," "Project Coordinators," and a "Fully Staffed Service Department."  *Id.*

Armstrong listed the following additional items underneath its logo: "40 year paint

warranty," "40 year wall panel warranty," "35 year roof panel warranty," and "Stainless

Steel Fasteners."  The evidence adduced at trial indicated that customers did not

7

receive any warranty documents.  The evidence further indicated that both Armstrong and General Steel provided pregalvanized steel and steel fasteners to customers for a premium, rendering that aspect of the comparison false.

19.   The "May the Best Building Win" webpage also stated "When You Compare, Armstrong Wins Every Time," and then stated:

> Looking for the best quality steel buildings?  There's really only 2 companies to consider - Armstrong Steel & General Steel.  The rest only pretend to deliver the best.  How do the two finest buildings on the market stack up against one another?  Take a look and decide for yourself.
>
> When compared to the competition, building versus building, Armstrong wins.  It's really that simple.  That's how confident Armstrong feels about it's [sic] buildings.  It's how committed Armstrong is to you.  Browse our buildings today and see how we stack up.
>
> Compare and you'll see for yourself why you should consider Armstrong.  Plus every Armstrong building is backed by the Best Warranties in America.

*Id.*  In small print at the bottom of the webpage was the following language: "General Steel Corporation and the associated logo are registered trademarks of General Steel Domestic Sales, LLC.  Comparison based upon sales offerings, marketing documentation and the companies [sic] websites as of June 23, 2010.  General Steel and Armstrong Steel are not affiliated in any manner."  *Id.* at GS00431.  The webpage remained active a year later.  *See* Ex. 9.

20.   As of September 14, 2011, additional language was added to the end of the "May the Best Building Win" webpage describing the purported capabilities and benefits of Armstrong's products.  *See* Ex. 10.  That language included use of "General Steel" and "general steel" in the following contexts: "Armstrong will Research, Plan and Price your General Steel Materials Construction Project," "Being one of the leading

providers of prefabricated general steel buildings and multi-purpose steel buildings projects . . .," "There are a number of reasons why customers turn to us with their multi purpose metal building and general steel buildings project development needs," "Armstrong general steel building structures," "general steel construction," "prefab general steel all purpose steel buildings," "prefabricated general purpose general steel structures," "typical steel buildings and general steel buildings," "general steel buildings and standard purpose metal buildings," "commercial general steel buildings," "general steel buildings and standard metal buildings," and "general steel framed buildings." Ex. 10. This version of the webpage was still accessible as of February 16, 2012. *See* Ex. 11.

  **21.** The additional language in the "May the Best Building Win" webpage also included the claim that Armstrong fabricated steel. *See* Ex. 10 at 2 ("Each piece of steel we fabricate . . ."). Armstrong did not and does not fabricate steel.

  **22.** Plaintiff provided evidence at trial of a website entitled generalsteelscam.com. Mr. Chumley denies that he operated the site. On March 20, 2012, the World Intellectual Property Organization ("WIPO") transferred control of the website to General Steel based on a complaint it filed against Mr. Chumley.[3] *See* Ex. 34. Regardless of whether Mr. Chumley operated the site, he admits to submitting large amounts of content to it. The evidence presented at trial did not establish that

---

[3] The Court has considered the WIPO decision for the limited purpose of finding that control of the website was transferred to General Steel. The Court has not considered the substance of the opinion for any other purpose, such as for establishing intent by Mr. Chumley. The Court has based its conclusions about intent or wilfulness on the evidence presented at trial.

such content was false.  Mr. Chumley's activity on the site, however, does indicate that Mr. Chumley was committed to damaging the reputation of General Steel.[4]

23.     The Court also finds, by a preponderance of the evidence, that Mr. Chumley authored and posted articles on the internet that purported to have been written by "Jeff Knight" or "Jeffrey Knight" and "Nathan Wright" about the prefabricated steel building industry.  *See* Exhibit 30.  As noted above, Jeffrey Knight is General Steel's founder and president.  Nathan Wright is General Steel's executive vice president.  The articles supposedly written by Jeffrey Knight indicated that he was the webmaster of GENERALSTEELSCAM.COM.  Some of the articles indicate that Jeff Knight is the CEO or owner of General Steel.  *See* Ex. 30 at GS01174, GS01210, GS01218, GS01221, GS01237.  Many of the articles indicate that "General Steel Scam" is a website that allows customers "who have been ripped off by General Steel" to document their complaints.  *See, e.g.*, *id.* at GS01168.

24.     As of September 14, 2011, the "May the Best Building Win" webpage claimed that "Armstrong will Research, Plan and Price your General Steel Materials Construction Project."  Ex. 10.

25.     The September 14, 2011 version of "May the Best Building Win" webpage included the claim that Armstrong is "America's leading steel building provider."  Ex. 10. The webpage also includes the following sentence: "Each piece of steel we fabricate is representative of our experience, know-how and cutting edge technology."  Ex. 10.

---

[4] Such evidence may be relevant to a determination of whether any trademark or trade dress violations were willful.  The Court notes, however, that plaintiff does not have a commercial disparagement claim against Armstrong.

That claim remained on the webpage as of February 16, 2012.  *See* Ex. 11 at GS01276.  The rest of the webpage, however, makes no other fabrication claims, instead discussing buildings that Armstrong "provides."

26.     As of the trial, Armstrong's website identified it as an "OEM manufacturer" (literally, an "original equipment manufacturer manufacturer").

27.     Armstrong grossed $1,174,104 in sales in 2009 and earned $583,037 in net profit.  Ex. A-10.  Armstrong grossed $3,075,115 in sales in 2010 and earned $649,232 in net profit.  Ex. A-10.

## B.     CONCLUSIONS OF LAW

Plaintiff contends in its first and fifth claims for relief that Armstrong violated its trademark rights and, in so doing, engaged in unfair competition under state law. Plaintiff's second claim for relief asserts that Armstrong engaged in false advertising in violation of the Lanham Act.

### 1.  Trademark/Unfair Competition

General Steel argues that Armstrong's use of the phrase "General Steel Buildings" (or the lowercase "general steel") in its Google AdWords advertisement copy, as a paid keyword through the AdWords program, and in the text of several websites created by Armstrong infringes General Steel's registered federal trademark in violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and constitutes unfair competition under Colorado law.

Pursuant to the Lanham Act, 15 U.S.C. § 1114(1), one may not, without consent:

use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution,

> or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a).  To succeed on its trademark claim, General Steel must have established (1) that it has a valid and protectable mark in the term "General Steel"; (2) that Armstrong used "General Steel" in commerce without General Steel's consent; and (3) that there is a likelihood of confusion between "General Steel" and Armstrong's use of "General Steel Buildings."  *See Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).[5]

Turning to the elements of General Steel's trademark claim, defendants do not dispute that General Steel did not consent to Armstrong's use of the words "General Steel."  Nor does Armstrong dispute having used the phrase "General Steel" in commerce.  Rather, it argues that General Steel does not have a valid and protectable mark in the words "General Steel," and has failed to show a likelihood of confusion.  The Court disagrees.

Pursuant to § 1057(b) of Title 15 of the United States Code, "[a] certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark,

---

[5] Plaintiff also contends that Armstrong engaged in unfair competition under Colorado law.  Plaintiff argues that such a claim is broader than, and not analyzed in parallel with, its Lanham Act trademark claim, citing *NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126 (D. Colo. 2007).  The *NetQuote* court, however, made clear that "the tort of unfair competition in Colorado has not been expanded to provide a cause of action for any alleged improper conduct by a competitor that deceives a plaintiff or its clients."  *Id.* at 1133.  Furthermore, the Tenth Circuit, in *Utah Lighthouse Ministry*, has since made clear that "[t]rademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together as an action brought under . . . section 43 of the Lanham Act."  527 F.3d at 1050.

of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate."  General Steel registered its trademark with the United States Patent and Trademark Office on May 18, 2001.  *See* Ex. 2.  The registration included the General Steel logo, consisting of the outline of a building with horizontal lines and the words "General Steel Corporation," with "General Steel" appearing in letters over twice as large as the letters of the word "Corporation."  *See id.*  General Steel has demonstrated that its logo is presumptively valid, shifting the burden to Armstrong to rebut the presumption.[6]

Instead of offering evidence of invalidity, however, Armstrong contends that plaintiff enjoys no protection for the words "General Steel" when used separately from its registered logo.  The Court, however, concludes that the words "General Steel" are the "most salient feature" of plaintiff's registered logo mark and, thus, the presumption of validity extends to those words as well.[7]  *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005) ("In *Park 'N Fly* [*v. Dollar Park and*

---

[6] General Steel also contends that, because it has been in continuous use since registration more than five years ago, its trademark is now "incontestable."  *See* 15 U.S.C. § 1065.  During the trial, however, plaintiff did not introduce evidence that it filed "an affidavit . . . with the Director within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce . . . ."  15 U.S.C. § 1065(3).

[7] As stated in the findings of fact, General Steel has also registered the word mark "GENERAL STEEL CORPORATION."  *See* Ex. 1.  Armstrong has not offered any evidence to rebut the presumption that General Steel's word mark is valid.  For the purpose of this analysis, however, the Court need not decide whether the presumption of validity in the work mark "General Steel Corporation" extends to the phrase "General Steel" standing alone.

*Fly, Inc.*, 469 U.S. 189, 201 (1985)], the words were held to be the most salient feature of a logo with an airplane; whereas in this case the words in white on a black background are virtually the only salient feature of the logo."). Defendants' failure to produce any evidence rebutting the presumption of validity is sufficient grounds for concluding that General Steel has a valid and protectable mark in the term "General Steel."

Furthermore, although it did not bear the burden of doing so, plaintiff has established that "General Steel" has acquired secondary meaning and therefore is entitled to protection. "A mark has acquired secondary meaning if because of association with a particular product or firm over a period of time it has come to stand in the minds of the public as a name or identification for that product or firm." *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988) (internal quotations and citations omitted). As outlined above in the findings of fact, plaintiff presented circumstantial evidence regarding: "(1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (citation and quotation marks omitted).

General Steel has spent over $50 million on marketing since the late 1990s, primarily on radio advertisements. Those advertisements, by their nature, do not include the logo. Mr. Knight testified that the advertisements were aimed at creating an association in people's minds between steel buildings and his company and that, in his estimation, that association was achieved. The Court finds that the record supports

14

that belief.  Mr. Knight testified–and defendants did not dispute–that General Steel is the third most searched term in the metal building industry after generic searches for "steel buildings" and "metal buildings."

Widespread awareness of the plaintiff's name is corroborated by the nature of Armstrong's use of the term "general steel" in the copy of its AdWords advertisements. *See, e.g.*, Ex. 3 at GS00248 ("<u>Don't Buy General Steel</u> Without Pricing Armstrong First").  Armstrong's advertisements reveal that Armstrong deems "General Steel" to be a strong mark associated with a particular company.  The Court finds that, if Armstrong considered itself a seller of "general steel" buildings, it would not have issued advertisements instructing consumers not to buy "general steel."  *See id.*  Moreover, Armstrong apparently determined that using "General Steel" would catch the attention of consumers interested in buying General Steel Corporation products.  *See* Docket No. 95-2 at 4 ("<u>General Steel Buildings</u>.  Before You Buy General Steel Price Armstrong Steel First!").  Armstrong presented no credible evidence that "general steel" is a term actually used to describe the product sold by either General Steel or Armstrong.[8]

Further, the Court has found that Mr. Chumley was responsible for creating a website entitled generalsteelscam.com.  The Court does not believe that, if Mr.

---

[8] Armstrong points to its use of "general steel" on its website to describe certain products.  That use demonstrates an attempt to embed search terms in website text, often with awkward results.  *See, e.g.*, Ex. 11 at GS01276 ("prefab general steel all purpose steel buildings").  This merely emphasizes the point that Armstrong was targeting General Steel by use of that term.  The only other documents using "general steel" in the manner offered by Armstrong are the articles purportedly written by Jeff Knight for which the Court has found Mr. Chumley to be responsible.  *See, e.g.*, Ex. 30 at GS01188.  These articles' use of "general steel" seems to be an effort by Mr. Chumley to direct consumers conducting internet searches regarding General Steel to these disparaging articles.

Chumley was in the business of selling "general steel," he would create a website with a title implying that the product might be a scam.  Rather, the website was intended, and likely was understood, to be directed at plaintiff.  *See* Ex. 30 at GS01168 ("General Steel Scam is a worldwide online consumer reporting Web site and publication that allows customers who have been ripped off by General Steel to file and document complaints about General Steel Buildings, Anthem Steel Buildings, Discount Steel Buildings, Capital Steel Buildings and CEOs Jeff Knight and Nathan Wright.").

The question then becomes whether there is a likelihood of confusion between "General Steel" and Armstrong's use of the term in its AdWords campaign and on websites it has created.  *See Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).  The Court begins by assessing the likelihood of confusion caused by Armstrong's use of "General Steel" or "general steel" in the copy of its Adwords advertisements.  The Court next assesses the likelihood of confusion based on Armstrong's purchase of "general steel" as a keyword for internet searches.

"Several factors are relevant in determining whether there is a likelihood of confusion: (i) the degree of similarity between the marks, including the mark's appearance, pronunciation, suggestion, and manner of display; (ii) strength or weakness of the plaintiff's mark; (iii) the intent of the alleged infringer in adopting its mark; (iv) similarities and differences of the parties' goods, services, and marketing strategies (also stated as the relation in use and the manner of marketing between the goods and services marketed by the competing parties); (v) the degree of care likely to be exercised by purchasers of the goods or services involved; and (vi) evidence of

16

actual confusion." *HealthONE of Denver, Inc. v. UnitedHealth Group Inc.*

872 F. Supp. 2d 1154, 1174 (D. Colo. 2012) (citing *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998)).

The Court begins by noting that the similarity in the products sold and the parties' respective marketing strategies, particularly more recently, weigh in favor of finding a likelihood of confusion. In addition, the similarity in sound and plain text appearance of "General Steel" and Armstrong's use of "General Steel Buildings" in its ads are quite strong. *See Vail Associates, Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 869 (10th Cir. 2008) ("The degree of similarity between marks turns upon sight, sound, and meaning."); *cf. Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002) ("'Generic Value Products' . . . is not visually similar to 'GENERIX.' Marianna's mark consists of three words, while Beautyco's consists of only one. Although both marks begin with the same six letters, this similarity is not enough to outweigh the visual differences in the marks."). Armstrong bases its argument that the marks are dissimilar on a comparison of plaintiff's logo and its use of "General Steel Buildings." But, as the Court concluded above, plaintiff holds a protected word mark in "General Steel," and Armstrong does not contest the similarity of its word usage and that mark.[9]

As noted above, the nature of Armstrong's use of "general steel" indicates that the mark has acquired significant strength. That use, however, does not so clearly

---

[9] Furthermore, to the extent Armstrong attempts to distinguish its use by noting that it does not use "Corporation" after "General Steel," the Court finds such an argument unavailing. As noted above, "General Steel" is the most salient feature of the registered mark and the phrase "General Steel" has acquired secondary meaning. Therefore, omission of the word "corporation" does not permit Armstrong to use "General Steel."

establish an intent to cause confusion.  Rather, as demonstrated by Armstrong and Mr.

Chumley's creation of other websites dedicated to maligning General Steel, the

advertising campaign was largely designed to create a strong contrast between the

companies, as illustrated by use of the phrase "Don't Buy General Steel."

Nevertheless, there were some advertisements that demonstrate an intention to

confuse consumers.  *See* Ex. 3 at GS00118 ("General Steel Buildings

www.ArmstrongSteelBuildings.com); Ex. 3 at GS00299 ("General Steel Buildings . . .

www.ArmstrongSteelBuildings.com); Ex. 3 at GS00305.[10]  It is these advertisements to

which the Court assumes plaintiff refers when it argues that Armstrong caused initial

interest confusion.  "Initial interest confusion is a 'bait and switch' tactic that permits a

competitor to lure consumers away from a service provider by passing off services as

those of the provider, notwithstanding that the confusion is dispelled by the time of

sale."  *Vail Associates*, 516 F.3d at 872.  In light of the nature of the advertisements, the

Court suspects that certain customers may well have been lured to Armstrong's website

believing they were heading to General Steel's.  Although those customers could have

easily left upon having any confusion dispelled, Armstrong would have potentially

benefitted from the goodwill of General Steel by retaining any customers who were

initially confused.

---

[10] On September 5, 2012, plaintiff filed a document entitled "Plaintiff's
Submission of New Additional Evidence" [Docket No. 334] to which it attaches what it
contends to be evidence of an ongoing advertisement campaign directed at General
Steel.  On December 12, 2012, plaintiff filed a similar document entitled "Plaintiff's
Submission of New Evidence Regarding Judicial Arbiter Group Posting by Defendants."
Docket No. 337.  Plaintiff, however, has not filed a motion seeking to reopen the
evidence.  The Court has therefore not considered this evidence.

However, "a court cannot simply assume a likelihood of initial interest confusion, even if it suspects it," as the "proponent of such a theory must prove it." *Id.*; *cf. Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) ("[W]hen we examine initial interest confusion, the owner of the mark must demonstrate likely confusion, not mere diversion."); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1173 (D. Utah 2010) ("'Likelihood of confusion' signifies more than a mere possibility.").

Other than its suspicions, plaintiff offered no evidence at trial of actual confusion. Although plaintiff is "not required to bring forth incidents of actual confusion to succeed in an infringement case," *Sensient Technologies Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010), this factor weighs against finding a likelihood of confusion.  Moreover, the fifth factor in the test, degree of care used when purchasing the product, greatly diminishes any initial advantage Armstrong might have gained from improperly drawing people to its website.  Evidence at trial showed that steel buildings are expensive, complicated to erect, and are not the type of purchase that would be made without a thorough consideration of the available options.  The degree of care required to purchase a steel building decreases the likelihood that a customer's choice would be significantly impacted by stumbling across one company's website before another's.  These factors cut against a likelihood of confusion between the two companies based on the use of "general steel" in Armstrong's AdWords campaign.

In light of the foregoing, the Court finds that plaintiff has failed to demonstrate a likelihood of confusion between Armstrong's use of "General Steel" in the advertising

copy of its AdWords campaign and plaintiff's protected word mark.  While Armstrong

was using the term to refer to plaintiff's company, the Court does not find the record

supports the finding that such use was likely to cause confusion among consumers in

light of all of the surrounding information that identified Armstrong Steel as the source

of the website and distinguished Armstrong Steel from General Steel.  *Cf. Toyota Motor*

*Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010) ("[R]easonable,

prudent and experienced internet consumers . . . . skip from site to site, ready to hit the

back button whenever they're not satisfied with a site's contents.  They fully expect to

find some sites that aren't what they imagine based on a glance at the domain name or

search engine summary.").  General Steel's theory of the case appears directed more

toward notions of commercial disparagement.  To the extent it contends that the

AdWord campaign constitutes trademark infringement, the Court finds that evidence

falls short of establishing a likelihood of confusion.

Armstrong did include language on the "May the Best Building Win" webpage as

of September 14, 2011 that could potentially confuse a consumer: "Armstrong will

Research, Plan and Price your General Steel Materials Construction Project," "Being

one of the leading providers of prefabricated general steel buildings and multi-purpose

steel buildings projects . . .," "There are a number of reasons why customers turn to us

with their multi purpose metal building and general steel buildings project development

needs," "Armstrong general steel building structures," "general steel construction,"

"prefab general steel all purpose steel buildings," "prefabricated general purpose

general steel structures," "typical steel buildings and general steel buildings," "general

steel buildings and standard purpose metal buildings," "commercial general steel

buildings," "general steel buildings and standard metal buildings," and "general steel framed buildings." Ex. 10. Nevertheless, this language appeared on a website devoted to contrasting Armstrong with General Steel. In that context, the references are more likely to appear discordant rather than to confuse potential customers as to the source of the product.

The Court finds that defendants' use of "general steel" as a supposedly generic term in website copy was intended to further Armstrong's web search optimization, that is, to increase the likelihood Armstrong's website would appear near the top of the list of organic search results whenever someone ran a search for "general steel." Armstrong also purchased the term "general steel" as a keyword from search engines so that searches incorporating that term would trigger the display of Armstrong's advertisements in the "sponsored links" section of the search results. These uses of "general steel" are not sufficient to support a trademark violation on the theory of initial interest confusion. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1174 (D. Utah 2010) ("Because a consumer cannot see a keyword, nor tell what keyword generated an advertisement, the court concludes that the mere purchase of a trademark as a keyword cannot *alone* result in consumer confusion. Accordingly, the relevant inquiry here regarding consumer confusion is not just what keyword was purchased, but what was the language of the advertisement generated by that keyword.") (emphasis in original).

Advertisements on Google appear in a list as distinct and independent entries that internet users can browse and select at will. *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, 2007 WL 30115 at *7 (E.D. Pa. Jan. 4, 2007). Although the

appearance of a link in a results list may enhance the likelihood that a user will view the associated page, the user must still make an affirmative decision to select the link.  In addition, the connection between the search term entered and the appearance of an advertisement is too attenuated to suggest an actual affiliation between the two.  *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 856 (N.D. Tex. 2009).  Now that "the internet and its vast search capabilities are no longer new to society as a whole," it is much less likely that potential customers–especially the sophisticated business people purchasing steel buildings–would be led by the appearance of an advertisement to believe that two companies known to be in competition were actually affiliated.  *S. Snow Mfg. Co. v. Sno Wizard Holdings, Inc.*, 829 F. Supp. 2d 431, 436-37 (E.D. La. 2011).  Plaintiff's argument is premised on the assumption that potential customers entering the term "general steel" into a search engine are searching exclusively for that company, as opposed to executing a broader search for all companies selling similar products.  *Id*. at 436.  In light of this possibility, an overly restrictive rule could actually "destroy the valuable resource that search engines have become if it prevents those search engines from doing what they are designed to do: present users with the information they seek as well as related information the user may also find helpful or interesting."  *Mary Kay*, 601 F. Supp. 2d at 856.

For the reasons discussed above, the Court does not find that the advertisements were likely to confuse consumers.  Furthermore, as previously mentioned, many of the actual uses of the keywords "general steel" in website text occurred either in the context of a clear comparison or in a context that, while puzzling,

was unlikely to confuse consumers as to source.[11]  *Cf. North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1223 (11th Cir. 2008) (concluding that a search result had more potential to confuse where there were indications of association including the absence of "comparative advertising in [defendant's] website which would have made clear to consumers that [plaintiff's] and [defendant's] products are competing").

## 2.  False Advertising

General Steel alleges that Armstrong engaged in false advertising in violation of the Lanham Act.  The Lanham Act imposes liability on those who "in commercial advertising or promotion, misrepresent[] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  A false advertising claim comprises four elements: "(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce,[12] (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff."  *Sally Beauty Co.*, 304 F.3d at 980.

General Steel alleges that Armstrong violated the Lanham Act by: (1) presenting

---

[11] Even assuming that the few advertisements that did not starkly contrast General Steel and Armstrong were found to support a trademark violation, plaintiff has failed to establish any basis for relief.  First, plaintiff seeks a permanent injunction, but it admits that the AdWord campaign was discontinued.  Plaintiff contacted the search engine companies, who required Armstrong to stop the campaign.  Therefore, even assuming Armstrong desired to reinstitute the advertisements, plaintiff fails to demonstrate that it would be possible to do so or that plaintiff would lack an adequate remedy.

[12] There is no dispute that the statements at issue were made in commerce.

itself as a manufacturer that fabricates steel buildings; (2) purporting to use an on-site

environmentally controlled painting facility and laser precision engineering; (3) issuing

press releases authored under false names touting its charitable endeavors and the

international demand for its products; (4) overstating its size and status in the industry;

for example, by referring to itself in 2010 as "the leader in metal buildings;" (5) stating

that it provided pregalvanized steel and steel fasteners as standard features and that

General Steel did not; (6) stating that Armstrong provides "general steel buildings" and

"general steel construction;" (7) advertising a generous warranty, but failing to provide

customers with warranty documents; and (8) presenting itself as an "OEM

manufacturer."

### a.  Falsity

To fall within the Lanham Act, a statement must be either literally false (that is,

false on its face or by necessary implication) or, "although literally true, likely to mislead

and to confuse consumers given the merchandising context."  *Scotts Co. v. United*

*Indus. Corp.*, 315 F.3d 264, 272-73 (4th Cir. 2002); *Gennie Shifter, LLC v. Lokar, Inc.*,

No. 07-cv-01121-JLK-MJW, 2010 WL 126181 (D. Colo. Jan. 12, 2010).  To show that a

literally true statement is misleading, a plaintiff must present extrinsic evidence

establishing that the challenged advertisement tends to mislead or confuse consumers.

*Scotts Co.*, 315 F.3d at 273.

The Court finds that Armstrong's claims were literally false, with three

exceptions.  First, Armstrong's warranty claims were not literally false, since there is no

evidence that Armstrong has disclaimed warranties, wrongfully denied claims under an

existing warranty, or otherwise altered the terms of existing warranties.  Under the Uniform Commercial Code, an express warranty is created by any "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  U.C.C. § 2-313(1)(a).  There was no evidence that the representations made to Armstrong customers were insufficient to create a binding and enforceable warranty.  *See also Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 644-46 (10th Cir. 1991) (holding that statements made in "brochures or other promotional literature" can create an express warranty even in the absence of actual customer reliance).

Second, the evidence at trial was not sufficient to distinguish Armstrong's claims regarding industry leadership from puffing.  Puffing is "[t]he expression of an exaggerated opinion–as opposed to a factual misrepresentation–with the intent to sell a good or service."  BLACK'S LAW DICTIONARY 1353 (8th ed. 2004).  The two key features of puffery are its resistance to verification and its tendency to be filtered out by consumers as expected exaggeration.  *Alpine Bank v. Hubbell*, 555 F. 3d 1097, 1106 (10th Cir. 2009); David A. Hoffman, *The Best Puffery Article Ever*, 91 IOWA L. REV. 1395, 1402-03 (2006).  In addition, courts consider the relative expertise and overall size of the audience for a particular claim; the greater the buyer's expertise or the wider the audience, the more likely it is that the statement is puffery.  *Alpine Bank*, 555 F.3d at 1106-7.

In contrast to terms like "safest" or "quicker" that are capable of precise measurement, the term "leading" is like "best" in that, on its own, it is too vague for objective evaluation.  *See Giles v. Inflatable Store, Inc.*, No. 07-cv-00401-PAB-KLM,

2009 WL 961469, at *3-4 (D. Colo. Apr. 6, 2009); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 2011 WL 1336473, at *7-8 (D.N.M. Mar. 31, 2011).  General Steel has not provided a concrete definition of the term against which to measure Armstrong's claims.  Given the relative sophistication of individuals seeking to purchase steel buildings, the size of the audience targeted by internet advertising, and the placement of these claims within lengthy paragraphs extolling the unspecified virtues of Armstrong,[13] there is no evidence that any consumer did or would interpret these claims as anything more than puffing.

Third, General Steel did not show by a preponderance of the evidence that Armstrong's claim to be an OEM manufacturer is false.  Armstrong's witnesses consistently testified that an OEM manufacturer is an entity that designs, but does not manufacture, the components of the products it sells, and that Armstrong employs engineers to design the components of its steel buildings.  The Court finds that this testimony was credible.  Moreover, General Steel did not present evidence showing that this term did or would mislead consumers.

As General Steel did not present sufficient evidence to show that Armstrong's warranty offer, its characterization of itself as an industry leader, or its characterization of itself as an OEM manufacturer were misleading, these statements cannot support a false advertising claim under the Lanham Act.

---

[13] For example, "Your experience working with Armstrong Steel Buildings will rank among the most satisfying possible due in large part to our insistence on superior customer service and craftsmanship at every turn."  Ex 12. at GS 00080.

### b. Confusion

Armstrong argues that General Steel has failed to provide evidence of actual consumer confusion.  However, such evidence is not necessary.  A finding of either intent to deceive or literal falsity allows a court to presume the element of deception. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 281 (4th Cir. 2002).  "Once it is shown that a defendant deliberately engaged in a deceptive commercial practice . . . a powerful inference may be drawn that the defendant has succeeded in confusing the public" and "the burden shifts to the defendant to demonstrate the absence of consumer confusion."  *Res. Developers, Inc. v. Statute of Liberty-Ellis Island Found.*, 926 F.2d 134, 140 (2d Cir. 1991); *NetQuote*, 2008 WL 2552871, at *12.

In this case, the Court has found both literal falsity and intent to deceive. Armstrong's intent is evidenced by its persistent use of deceptive means to undermine General Steel's reputation.  Mr. Chumley's 2010 email instructing an online marketing consultant to "maximize" the use of General Steel's name because Armstrong was in litigation, Ex. 7, is indicative of Armstrong's determination to target General Steel. When the search engines prohibited Armstrong from running advertisements improperly using General Steel's name, it launched "May the Best Building Win," and, after discovery closed, expanded the page to state numerous times that Armstrong offered "general steel buildings" and "general steel construction."  In addition, Mr. Chumley contributed content to the website generalsteelscam.com and falsely attributed articles he published online to Jeffrey Knight and Nathan Wright, indicating his commitment to damaging General Steel's reputation.

The Court presumes that the following false statements on the part of Armstrong were likely to confuse consumers: (1) presenting itself as a manufacturer that fabricates steel buildings; (2) purporting to use an on-site environmentally controlled painting facility and laser precision engineering; (3) issuing press releases authored under false names touting its charitable endeavors and the international demand for its products; (4) stating that it provided pregalvanized steel and steel fasteners as standard features and that General Steel did not; and (5) stating that it provides "general steel buildings" and "general steel construction."

### c. Materiality

To establish materiality, a plaintiff must show that a given claim is likely to influence purchasing decisions. *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1060 (D. Kan. 2006). Statements that misrepresent an "inherent quality or characteristic" of a product are likely to influence purchasing decisions. *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997).[14] For example, cashmere content is "an inherent and important characteristic" of a blazer labeled "Cashmere and Wool." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d

---

[14] Although some circuits have held that a plaintiff need not show that a literally false advertisement was also material, the Tenth Circuit has not decided this issue, and thus the Court will treat materiality as a required element in this case. *See Sunlight Saunas*, 427 F. Supp. 2d at 1058 ("When defendant's advertisement is literally false, circuits differ whether plaintiff must show materiality. The Tenth Circuit has not squarely addressed the question, but the First, Second and Eleventh Circuits have required plaintiffs to prove that false or misleading statements are material. . . . The Fifth Circuit has held that where defendant has made literally false statements, defendant's statements are presumed to mislead consumers and plaintiff need not produce evidence on materiality.") (internal citations omitted).

302, 312 (1st Cir. 2002).

Evidence at trial established that a company's manufacturing capabilities and features such as pregalvanized steel and steel fasteners are inherent qualities of steel buildings.  Mr. Beavers, Armstrong's Vice President of Operations, testified that steel fasteners and pregalvanized steel add to the value of a building because they do not rust and that offering these features gives Armstrong a competitive edge.

The Court finds that the following statements on the part of Armstrong concern features inherent to steel buildings and are thus likely to influence purchasing decisions: (1) presenting itself as a manufacturer that fabricates steel buildings; (2) purporting to use an on-site environmentally controlled painting facility and laser precision engineering; (3) stating that it provides pregalvanized steel and steel fasteners as standard features and that General Steel does not; and (4) stating that it provides "general steel buildings" and "general steel construction."

### d.  Injury

Armstrong argues that General Steel's Lanham Act claim fails for lack of evidence that General Steel was injured by Armstrong's statements.  The Court concurs with respect to those advertisements that concerned only Armstrong's own products without making reference to General Steel.  General Steel failed to put on evidence that it lost customers, revenue, or goodwill, or was otherwise harmed by Armstrong falsely claiming to possess on-site painting or laser engineering facilities.  Testimony at trial established that General Steel's sales began to decline seven years before Armstrong entered the market.  This decline was driven by the broader economic downturn and the action brought by the Colorado Attorney General against General Steel.  General

Steel asserted that it had to lay off a number of employees as a result of Armstrong's campaign, but did not establish a causal link between Armstrong's statements and the layoffs.

The Court may, however, presume that Armstrong's comparative advertising campaign injured General Steel. With respect to the elements of causation and injury, there is a distinction between advertising that explicitly compares one product with another and advertising that references only the defendant's own product. *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997). Injury may be presumed when a defendant's statements are "literally false or demonstrably deceptive" and "injury would indeed likely flow from the defendant's objectionable statements, i.e., when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product" *Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000); *Hill's Pet Nutrition, Inc. v. Nutro Products, Inc.*, 258 F. Supp. 2d 1197, 1203 (D. Kan. 2003). "A misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer." *Porous*, 110 F.3d at 1335 (citing *McNeilab, Inc. v. Am. Home. Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988)).

In contrast, where the advertising at issue is not explicitly comparative, a presumption of injury is inappropriate because each competitor's injury may be only "a small fraction of the defendant's sales, profits, or advertising expenses." *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 871, 885 (W.D. Tex. 2001) (quoting *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 n.8 (9th Cir. 1989)). Some

courts have required a showing of intent or wilful deception in order to trigger a presumption of injury.  *Id*. at 885 n.119 (citing *Porous*, 110 F.3d at 1335-36).  Where no presumption of injury arises, the plaintiff must show that injury has actually occurred or is likely to occur as a result of the misleading statements, either by direct diversion of customers or by a loss of goodwill.  *Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004).  When the presumption of injury applies, a plaintiff must still provide "an evidentiary basis, showing actual harm caused by" the false advertising to obtain money damages.  *Porous*, 110 F.3d at 1333; *Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*, 182 F. App'x 267, 273 (4th Cir. 2006) ("damages are presumed only as to causation; the *extent of money damages* is a separate matter that must have evidentiary support") (emphasis in original).

Armstrong made the following material false statements in the context of its comparative advertising campaign: (1) presenting itself as a manufacturer that fabricates steel buildings; (2) stating that it provided pregalvanized steel and steel fasteners as standard features and that General Steel did not; and (3) stating that it provides "general steel buildings" and "general steel construction."  Because Armstrong made these statements in the context of advertisements explicitly comparing Armstrong and General Steel, and because the Court has found that Armstrong engaged in a pattern of willful deception, the Court presumes that these statements injured General Steel.

However, because General Steel has not provided an evidentiary basis for the extent of its injury, its claim for false advertising survives only to the extent it seeks injunctive relief and disgorgement of profits.

31

### 3.  Relief

#### a.  Injunction

In order to obtain a permanent injunction, a plaintiff must show that such relief is warranted under general principles of equity.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. ___, 130 S.Ct. 2743, 2748 (2010).  Equity requires a plaintiff to show that (1) it has suffered or will suffer an injury for which it lacks an adequate remedy at law; (2) the balance of hardships favors injunctive relief; and (3) an injunction is not adverse to the public interest.  *Id.*; *Sanders v. Mountain. Am. Fed. Credit Union*, 689 F.3d 1138, 1144 (10th Cir. 2012).  Injunctive relief "should be narrowly tailored to fit specific legal violations."  *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (internal citations omitted).

With respect to the first element, the loss of trade, goodwill, or control over one's reputation is generally considered to be irreparable through the award of money damages.  *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 237 (3d Cir. 2003).  In addition, a plaintiff has no adequate remedy at law in cases where the factfinder is unable to quantify the extent of injury and remedy that injury through the award of monetary damages.  *Haynes Trane Serv. Agency, Inc. v. American Std., Inc.*, 573 F.3d 947, 964 (10th Cir. 2009).  Courts have recognized that it is "virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement."  *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316 (2d Cir. 1982) (abrogated on other grounds by FED. R. CIV. P. 52(a))).  A court

may grant injunctive relief to remedy an injury presumed to arise from literally false comparative advertising. *See McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991); *see also Porous*, 110 F.3d at 1334-35; *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 27:30 ("it is proper in [cases of false comparative advertising] to presume injury and irreparable damage to support a preliminary injunction").

Evidence at trial established that General Steel's profitability has declined during the period in which Armstrong displayed false comparative advertising on its website. Mr. Knight explained that General Steel has had to lay off operations staff to afford a larger sales staff and, although its sales volume has remained relatively steady since 2009, the size of each sale has declined, and thus it is bringing in less revenue. Moreover, as discussed above, Armstrong's pattern of willful deception indicates it is likely to cause General Steel future harm, absent injunctive relief.

Furthermore, Armstrong has "no equitable interest in perpetuating the false and misleading claims" in its comparative advertising. *See PBM Prods.*, 639 F.3d at 127. Thus, the hardship on Armstrong of imposing an injunction narrowly tailored to prohibit the false statements identified above would not outweigh the hardship on General Steel of denying injunctive relief and thereby leaving it vulnerable to defendants' further dissemination of false statements.

Finally, the public has a considerable interest in preventing false or misleading advertising and promoting lawful competition. *See id.* at 127-28; *Osmose, Inc. v.*

*Viance, LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010); *Ford v. NYLCare Health Plans of Gulft Coast, Inc.*, 301 F.3d 329, 339 (5th Cir. 2002) ("an injunction against false advertising benefits the public without causing an undeserved windfall for the plaintiff") (citing *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 618 (6th Cir. 1999)).  Thus, this factor also favors granting an injunction.

Given that all the factors favor granting an injunction to General Steel, the Court will grant General Steel injunctive relief as specified in section C of this order.

### b. Disgorgement of Profits

General Steel requests disgorgement of profits for Armstrong's Lanham Act violations.  The Lanham Act provides that, upon establishing a trademark or false advertising violation, "the plaintiff shall be entitled, . . . subject to the principles of equity, to recover . . . defendant's profits[.]"  15 U.S.C. § 1117(a).  A disgorgement award may be predicated either on the theory that the defendant has unjustly enriched itself through misappropriation of the plaintiff's property interest in its protected mark or on the theory that an award of profits will deter future willful violations.  *W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1272-73 (10th Cir. 2005).  Disgorgement "is most appropriate if damages are otherwise nominal."  *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1171 (11th Cir. 2007); *Joint Stock Society v. UDV N. Am., Inc.*, 266 F.3d 164, 184 (3d Cir. 2001); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1095-96 (7th Cir. 1994).

Although a showing of actual damages is not necessary to obtain disgorgement,

it "remains relevant" to the Court's inquiry, especially given the "punitive nature of the remedy and the possible windfall to the plaintiff." *W. Diversified Servs.*, 427 F.3d at 1272-73.  Absent a showing of actual damages, willfulness is a necessary, but not sufficient, precondition to disgorgement. *Id*.  Willfulness is the "conscious desire" to "benefit from the goodwill or reputation" of the plaintiff.  *Id*. at 1274.  Other circumstances may also evidence willfulness, for example, if the "defendant deceives the plaintiff into thinking he has ceased [violating the Lanham Act]  when in the fact the illegal action continues" or if the defendant misrepresents the facts to the court.  *Id*.

Once a court has made a finding of willfulness, it must weigh the equities to "determine whether, in [its] judgment and within its wide discretion, the plaintiff may receive a portion of the infringing defendant's profits."  *Id*. at 1273.  As disgorgement is "truly an extraordinary remedy," it must be "tightly cabined by principles of equity."  *Id*. at 1274.  Equitable considerations include "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands."  *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 37 cmt. f (1995) ("a false comparison made by the defendant with the product of a specific competitor . . . may result in substantial harm to a specific plaintiff, thus sometimes justifying an accounting of profits.").

Here, Armstrong was not only asked by General Steel, but required by the major search engines, to stop using General Steel's name in its advertising.  Nonetheless,

Armstrong issued new advertisements falsely comparing itself to General Steel and falsely stating that it provides "general steel" buildings.  It continued to disseminate these false advertisements even after General Steel brought an administrative claim before the World Intellectual Property Organization and after the close of discovery in this case, showing that enforcement proceedings are not sufficient to deter Armstrong from disseminating false advertising.  Armstrong's pattern of willful deception betrays a conscious desire to benefit from false statements, which in turn supports a disgorgement award to deter future misconduct.

The first equitable consideration, namely, the certainty that the defendant benefitted from its unlawful conduct, tips in General Steel's favor, as Armstrong's rising profits, and its persistent use of false statements, show that it derived a commercial benefit from those statements.  *See George Basch*, 968 F.2d at 1540.  Moreover, Armstrong's "May the Best Building Win" webpages identified General Steel as the competitor who built the next best steel buildings as compared to Armstrong, thus identifying General Steel as one of its chief competitors, if not the chief competitor.  In addition, Mr. Chumley testified that Armstrong generates the vast majority of its leads through internet sales, indicating the importance of webpage design and internet advertising to its sales.  Second, other remedies appear to be inadequate, as evidenced by Armstrong's persistent use of false statements in the face of both legal and administrative proceedings.  *See id*.  Third, Mr. Chumley played a lead role in creating and disseminating the false advertisements.  *Id.*  Finally, the equities do not cut against General Steel insofar as there is no evidence that it sat on its rights or is otherwise undeserving of equitable relief.  *Id*.  Thus, a disgorgement award is

appropriate.  However, the Court will limit the disgorgement award according to the limited scope of the established violations.

In determining profits on which to base a disgorgement award, a plaintiff must prove "defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  That is, once plaintiff has established the amount of defendant's gross profits, such profits "are presumed to be the result of the infringing activity" and the defendant "bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead."  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993) (internal citations omitted).  "[C]ourts may engage in some degree of speculation in computing the *amount* of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing."  *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006) (internal citations omitted). "Some degree of speculation" with respect to calculating an award is permissible, "particularly [where] the need for speculation is attributable in part to Defendants' poor recordkeeping."  *Id*. at 1242.

The evidence at trial established that Armstrong earned a net profit of $583,037 in 2009 and $649,232 in 2010.[15]  Ex. A-10.  Armstrong did not present evidence showing that its earnings during this period were due to other, non-violative conduct, or that additional expenses should be deducted from its net profits.

---

[15] These figures are conservative, as they are based on Armstrong's own financial statements without taking into account the possibility that Mr. Chumley diverted profits by improperly charging personal expenses to the company.

Armstrong published its comparative advertisements for a period of at least 18 months, from mid-August 2010 through mid-February 2012.  However, there was no credible evidence at trial regarding Armstrong's gross or net earnings in 2011 or 2012. The Court will thus award as disgorgement Armstrong's profits during the four-and-a-half-month period in 2010 when it disseminated false comparative advertising. Armstrong's prorated profits for this period amounts to a total of $243,462.00.

### c.  Attorney's Fees

General Steel seeks an award of attorney's fees.  Federal Rule of Civil Procedure 54 provides that a "claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."  Such a motion must be filed no later than 14 days following entry of judgment, specify the grounds entitling the movant to the award, and set forth the amount sought. FED. R. CIV. P. 54(d)(2)(B); *see also* D.C.COLO.LCivR 54.3 ("a motion for attorney fees shall be supported by one or more affidavits.").

General Steel may seek its attorney's fees and costs consistent with the Federal and Local Rules cited above, wherein it must establish the rule or grounds entitling it to an award.  *See* Fed. R. Civ. P. 54(d)(2)(B)(ii).

## C.  CONCLUSION

For the foregoing reasons, the Court finds by a preponderance of the evidence that defendants are liable to plaintiff on Count Two.  It is therefore

**ORDERED** that defendants Ethan D. Chumley and Atlantic Building Systems,

LLC, doing business as Armstrong Steel Corporation, are enjoined from the following:

      a.      Falsely presenting Armstrong as a manufacturer of steel buildings or falsely stating that it fabricates steel buildings;

      b.      Falsely stating that General Steel does not provide pregalvanized steel and steel fasteners; and

      c.      Stating that Armstrong provides "general steel buildings" or "general steel construction."  It is further

**ORDERED** that this injunction is binding upon defendants, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.  It is further

**ORDERED** that judgment shall enter in favor of plaintiff General Steel Domestic Sales, LLC against defendants Ethan Daniel Chumley and Atlantic Building Systems, LLC in the amount of $243,462.00.  It is further

**ORDERED** that plaintiff is awarded its costs to be taxed by the Clerk of Court under Federal Rule of Civil Procedure 54(d)(1) and D.C.Colo.LCivR 54.1.

      DATED May 7, 2013.

                      BY THE COURT:

                      s/Philip A. Brimmer
                      PHILIP A. BRIMMER
                      United States District Judge