## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  10-cv-01398 PAB-KLM

GENERAL STEEL DOMESTIC SALES, LLC, d/b/a
GENERAL STEEL CORPORATION, a Colorado limited liability company,

Plaintiff,

v.

ETHAN DANIEL CHUMLEY, individually; and
ATLANTIC BUILDING SYSTEMS, LLC, a Delaware corporation, doing business as
ARMSTRONG STEEL CORPORATION.

Defendants.

---

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR AWARD OF ATTORNEYS' FEES

---

Plaintiff General Steel Domestic Sales, LLC, d/b/a General Steel Corporation, a Colorado

limited liability company, respectfully responds to Defendants' Motion for Award of Attorneys'

Fees [CM-ECF # 357].  Because Defendants cannot demonstrate that they meet the high

standards for a defendant to obtain attorneys' fees under either the Lanham Act or the Colorado

Consumer Protection Act, the Motion should be denied in all respects.

### *Lanham Act Standards and Application*

The legal standard for obtainment of attorneys' fees under the Lanham Act is that fees are

available only in "exceptional cases."  15 U.S.C. § 1117(a).  A case is "exceptional" where a

plaintiff brings an "oppressive" action.  *Eagles, Ltd. v. American Eagle Foundation,* 356 F.3d

724, 728 (6th Cir. 2004). The leading authority in this Circuit on whether prevailing defendants

can obtain fees is *National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143 (10th Cir. 2000).  In that case, the Tenth Circuit held that the standards for fee awards are different for prevailing plaintiffs and prevailing defendants.  *Id.* at 1148 and n. 4.

> The opinion further held that
>
> The statute itself does not define "exceptional cases," but the legislative history to the statute suggests two considerations for prevailing defendants who seek attorney fees. One, an objective consideration, is whether the suit was "unfounded." The other, a subjective consideration, is whether the suit was brought by the trademark owner "for harassment and the like."

*Id.* at 1146 (citations omitted).  As to objective criteria, the court cited Eighth and Ninth Circuit authority with approval, writing that "to be an exceptional case within the meaning of the statute, the plaintiff's suit must lack any reasonable foundation."  *Id.*  As to subjective criteria, "the court looks to the plaintiff's conduct in bringing the lawsuit and the manner in which it is prosecuted." *Id.* at 1148.  In an observation capturing both criteria, the court further observed that "[n]ot every losing suit is without foundation, and not every strategic decision by a plaintiff in bringing suit and in prosecuting it in a manner to enhance the prospects of success is done for the purpose of harassment or another improper purpose."  *Id.*  And "where a plaintiff sues under a colorable, yet ultimately losing, argument, an award of attorney's fees is inappropriate." *Eagles, Ltd.,* 356 F.3d at 728.

The Motion concedes the objective prong of the analysis:  on page 16, Defendants wrote that "General Steel's trademark infringement claims as pled were not factually baseless." Instead, the Motion rests exclusively on the notion that General Steel prosecuted the claims in bad faith.

General Steel's trademark case was premised upon Defendants' use of the term "General

Steel."  Defendants used that term in Google AdWords that targeted General Steel.  CM-ECF #

346 at p. 4, FINDING OF FACT # 8.  The Court found that in 2009, Defendants "had the following

sponsored advertisement on Google:  "General Steel buildings – Steel framed building /

Armstrong Steel … checkout various Armstrong Steel buildings – building frames for your

general steel buildings…." *Id.*  Defendants also ran sponsored advertisements in 2010 reading,

in part, "General Steel Buildings." *Id.* at p. 6, FINDINGS OF FACT # 15-16.  Defendants

maintained a "General Steel advertising campaign," both before and after the filing of this case.

*Id.* at p. 7, FINDING OF FACT # 17.  Still further, even after the close of discovery, Defendants

added language to the May the Best Building Win page reflecting that "Armstrong will

Research, Plan and Price your General Steel Materials Construction Project," "Being one of the

leading providers of prefabricated general steel buildings and multi-purpose steel buildings

projects . . .," "There are a number of reasons why customers turn to us with their multi purpose

metal building and general steel buildings project development needs," "Armstrong general steel

building structures," "general steel construction," "prefab general steel all purpose steel

buildings," "prefabricated general purpose general steel structures," "typical steel buildings and

general steel buildings," "general steel buildings and standard purpose metal buildings,"

"commercial general steel buildings," "general steel buildings and standard metal buildings," and

"general steel framed buildings." *Id.* at pp. 8-9, FINDING OF FACT # 20.  The Court found that

**"Armstrong was targeting General Steel by use of that term."** *Id.* at p. 15 n. 4.  This is not

even materially disputed:  Defendants introduced Plaintiff's trademark infringement expert's

report, which addresses something Defendants themselves labeled the "General Steel-MAE

Campaign." TRIAL EXHIBITS A-1 and A-2.  Under such circumstances, a fee award is not

appropriate:

> The fact that Lovely Skin's presentation of evidence at trial did not prevail does not necessarily constitute evidence of bad intent. "Despite ruling against [counterclaimant], the Court is satisfied that [counterclaimant's] purpose prior to and throughout litigation was to vindicate what [counterclaimant] believed were its legal rights. The Court's impression at trial was that Lovely Skin genuinely believed that its pursuit of litigation was a reasonable business decision to protect what it assumed were validly registered marks. In short, the Court finds that Lovely Skin's actions in bringing this suit were not beyond the pale of acceptable conduct.

*Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 2012 U.S. Dist. LEXIS 181031, 10-11, 2012 WL 6680394 (D. Neb. Dec. 21, 2012).

Consistent with Defendants' admission that "General Steel's trademark infringement claims as pled were not factually baseless," General Steel's trademark infringement claim[1] survived summary judgment.  CM-ECF #233 at pp. 4-5; CM-ECF #317 at pp. 2-3.  The Court held not only that General Steel had demonstrated a presumptively valid trademark, but also that its word mark had acquired secondary meaning in the marketplace "and is therefore entitled to protection."  CM-ECF # 346 at p. 14.  Indeed, on summary judgment, Defendants argued that General Steel "is unable to provide any evidence of the validity of its unregistered marks: the words and name 'General Steel'" or as to "the validity of its alleged common law marks."  CM-ECF # 230 (DEFENDANTS' TRIAL BRIEF) at pp. 2-3.  The Court rejected those positions both on

---

[1]   The Motion's page 1 proposes that General Steel eliminated "claims" in connection with Rule 12 practice, but that is not so:  Plaintiff initially averred only one trademark infringement claim, which survived Rule 12 and summary judgment practice through to trial. *See also Lorillard Tobacco Co. v. Engida,* 611 F.3d 1209, 1215 (10th Cir. 2010) ("Voluntary dismissal of an action ordinarily does not create a prevailing party because in order to create a prevailing party there must be a judicially sanctioned change in the legal relationship of the parties.").

summary judgment[2] and at trial.

The question on which the Court found Plaintiff's trademark infringement evidence to be

lacking was on "whether there was a likelihood of confusion between 'General Steel' and

Armstrong's use of the term in its AdWords campaign and on websites it has created." *Id.* at p.

16.  To resolve that question, the Court engaged in a six-factor analysis spanning pages 16-22 of

its May 7, 2013, Order.  The Court found weight in Plaintiff's favor on three of those six factors:

degree of similarity between the marks, strength of the mark, and similarity in products and

marketing strategies. *Id.* at p. 17.  The Court further found that "there were some advertisements

that demonstrate an intention to confuse consumers"—a fourth of the six factors. *Id.* at p. 18.

Ultimately, the Court found that Plaintiff's trademark infringement claim failed because of the

counterweight of two of the six factors:  the degree of care required to make a steel building

purchase and the absence of evidence of actual confusion. *Id.* at p. 19.

The Motion's Lanham Act argument's failure is apparent here.  After citing to the

Lanham Act legal standard, the Motion indicts Plaintiff for not producing evidence of actual

confusion—in other words, evidence on only one of six weighted factors under which one of

---

2       Positions taken by Defendants that were rejected on summary judgment by the Court include that "General has failed to provide any evidence of the validity of its unregistered marks," (CM-ECF # 95 at p. 6), "…nor has it offered <u>any</u> evidence of the validity of its marks," *id.*, that Defendants' use of "General Steel" was "distinct with General's Mark," *id.* at p. 8, that "Armstrong's use of the terms 'general steel' and 'general steel buildings' is not to cause confusion or deception amongst consumers but rather is to provide consumers with broader options for when shopping for steel buildings," *id.*, and that General Steel's "mark taken as a whole is descriptive of steel buildings," *id.* at 12.  They took the same rejected positions throughout the litigation:  CM-ECF # 17 DEFS' MOTION TO DISMISS, pages 4-5;  CM-ECF # 95 DEFS' MOTION FOR SUMMARY JUDGMENT, pages 6-8;  CM-ECF # 126 DEFS' REPLY RE MOTION FOR SUMMARY JUDGMENT, ¶ 2 & page 6;  CM-ECF # 230 DEFS' TRIAL BRIEF, pages 2-3;  CM-ECF # 323 DEFS' AMENDED FINDINGS OF FACT, ¶ 47.

5

three elements of a trademark infringement claim is evaluated.  This is, in short, too attenuated an argument to render this case "exceptional" under the Lanham Act.  Defendants cite no law to the contrary.

Still further, the Motion rests on a false premise:  that Plaintiff "failed even to attempt" proof of actual consumer confusion.  In so arguing, Defendants neglect yet another aspect of the case:  Plaintiff sought to amend the Final Pretrial Order to introduce precisely such evidence. CM-ECF # 146.  That Motion described Plaintiff's efforts to cull Defendants' 273 disclosed customers into a manageable list of witnesses that could have been included in the Final Pretrial Order submission.  More specifically, it lists Armstrong Steel customers who were diverted from their search for General Steel on the internet to Armstrong's site, and who thereafter became Armstrong's customers.  For example, Ms. Lee, Mr. Osborne and Mr. Flemming initially searched for General Steel, but were redirected to Armstrong's website.  *Id.* at pp. 4-5.  Although Plaintiff was denied leave to amend the Final Pretrial Order and to call those witnesses at trial, denial of such leave is a far cry from not having the evidence at all or "not even trying" to put it on.  *See also* CM-ECF # 95 (DEFENDANTS' MOTION FOR SUMMARY JUDGMENT) at pp. 3 and 9 ("In response to an interrogatory in which it was asked to identify all consumers that were confused as to the source, sponsorship or endorsement of Armstrong's goods due to Armstrong's use of internet advertising, General Steel identified four individuals.")

As noted above, Defendants concede that "General Steel's trademark infringement claims as pled were not factually baseless."  Defendants are thus resting their motion on a subjectively "bad faith" motivation argument.  But as described above, Plaintiff (a) proved two of three elements of its trademark infringement claim, (b) put on evidence weighing in its favor on four

of the six factors by which the third element is weighed, and (c) had amassed evidence on a fifth

factor that the Court deemed dispositive in the end.  Defendants have cited no authority that this

amounts to an "exceptional" case supporting a defendants' fee award, and to the undersigned's

knowledge there is no such authority.  *Compare 1-800 Contacts, Inc. v. Lens.com, Inc.,* 2012

U.S. Dist. LEXIS 4375 (D. Utah January 13, 2012):

> The main legal issue in this case involves an unsettled area of law given the emerging and changing nature of Internet competition. The Tenth Circuit has never expressly addressed whether purchasing another's trademark as a keyword constitutes trademark infringement, and such cases have survived motions to dismiss in other jurisdictions. Consequently, 1-800 Contacts had a legitimate interest in clarifying its rights. Moreover, once 1-800 Contacts obtained discovery, the evidence showed that Lens.com did purchase variations of 1-800 Contacts' trademark, even though such purchases were minuscule. 1-800 Contacts also had a larger claim based on secondary liability. Given the developing nature of the law in this area, and the fact that the case was proceeding on secondary liability, it was not unreasonable for 1-800 Contacts to continue pursuing its claim for direct infringement.

*Id.* at *9 (denying defendant's request for Lanham Act fees "Although 1-800 Contacts was

aggressive in pursuing its claims in this case, and in hindsight the expense may have been greater

than necessary to protect those rights.").

The Motion should be denied as to Lanham Act fees.

### *Colorado Consumer Protection Act Standards and Application*

The legal standard for a defendant's obtainment of Colorado Consumer Protection Act is

set forth in the Act itself:

> Any person who brings an action under this article that is found by the court to be groundless and in bad faith or for the purpose of harassment shall be liable to the defendant for the costs of the action together with reasonable attorney fees as determined by the court.

7

Colo. Rev. Stat. § 6-1-113(3).  *Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499 (Colo. App. 2003), has

addressed this provision, assessing fees where a "plaintiff presented <u>no evidence</u> to support his

deceptive trade practices claim."  *Id.* at 506.  *Wheeler* delved into what constitutes a Section 6-1-

113(3) "groundless" claim.  On that question, the Court of Appeals said that "[a] claim or defense

is groundless if the allegations of the complaint, although sufficient to survive a motion to dismiss

for failure to state a claim, are not supported by <u>any</u> credible evidence."  *Id.* at 505.  And in

addition, "[A]bsent evidence that the CCPA claim was pursued in bad faith or with a purpose to

harass, Lynx is not entitled to an award of attorney fees under" the CCPA."  *Campfield v. State*

*Farm Mut. Auto. Ins. Co*., 2007 U.S. Dist. LEXIS 67414, 3-4, 2007 WL 2688857 (D. Colo. Sept.

12, 2007) (no evidence of either public impact or of any knowing misrepresentation).[3]

Part of Defendants' CCPA Motion is premised upon the notion that Plaintiff could not

show actual injury—one of five elements of a CCPA claim.  In turn, that notion is premised upon

the theory that Plaintiff itself must have been deceived by Defendants' trade practices—a notion

dispelled by *Full Draw Productions v. Easton Sports, Inc.*, 85 F.Supp.2d 1001, 1007-08 (D.

Colo. 2000) ("Colorado courts have specifically recognized that business losses that result when

deceptive trade practices dissuade potential attendees from attending a trade show constitute an

injury to an interest legally protected by the CCPA.") (Brimmer, J.) and *Heller v. Lexton-Ancira*

*Real Estate Fund, Ltd*., 809 P.2d 1016, 1019-1022 (Colo. Ct. App. 1990), *rev'd on other*

---

[3]    "While the plaintiffs' evidence in this case ultimately proved to be inadequate, I cannot
find that the plaintiffs' evidence and argument were <u>so feckless or irrational that the plaintiffs'</u>
<u>continued pursuit of their CCPA claim must have been motivated by bad faith or a purpose to</u>
<u>harass</u>. Therefore, I find and conclude that the plaintiffs' pursuit of their CCPA was not
undertaken in bad faith or with a purpose to harass."  *Id.*

*grounds*, 826 P.2d 819 (Colo. 1992) (promoter of trade show had standing to bring a CCPA claim against competitor for misrepresentations relating to promoting competing trade show).  It is also premised upon the idea that Plaintiff could not demonstrate any lost business caused by Defendants' deceptive practices—which is dispelled by the customers that Plaintiff finally discovered and attempted to add to the case via amendment of the Final Pretrial Order and arranging for rebuttal witnesses.  Each of the customers Plaintiff listed in that Motion could have been General Steel customers but for Defendants' consumer deception.  The fact that they did not become General Steel customers injured General Steel.

There is no dispute that Defendants engaged in deceptive trade practices:  the Court has found that Defendants falsely advertised via the Internet.  Likewise, there is no dispute that the deception was publicly impactful:  the very nature of advertising is that it is publicly disseminated.  Finally, there is no dispute that the advertising occurred in the course of Defendants' business.  These are three of the five elements of a CCPA claim.  *See* CM-ECF # 233 at p. 3 n. 4.  That Plaintiff did not present the evidence it collected in connection with its Final Pretrial Order amendment request does not render Plaintiff's CCPA case "groundless."

Still further, in order to award a defendant fees, a court must find not only that a plaintiff's case was groundless, but also that it was brought in "bad faith or for the purpose of harassment."  As to this other half of the applicable standard, Defendants have failed to present any evidence.  The Motion's request for CCPA fees hinges upon page 18's prose about the Colorado Attorney General's office and Plaintiff's attempts to gather discovery about consumer deception and confusion.  This aspect of the Motion is no more than the unsupported writing of counsel, devoid of buttressing evidence.  Its narrative is disputed.  There is no support for the

notion that anything was "selectively forwarded" to the Attorney General's office, whether subject to a protective order or otherwise.

It is also devoid of authority establishing specific circumstances under which contact with an entity that is indisputably a law enforcement authority can be deemed "bad faith or for the purpose of harassment."  Such authority, if it existed, would be particularly important in circumstances under which, for example, Defendants' fictitious personnel were issuing false press releases.  CM-ECF # 346 pp. 4-5 ("Mr. Chumley was involved in the issuance of a number of internet press releases and internet articles that used false claims to publicize Armstrong's capabilities.").  The question this argument puts before the Court is whether, by seeking to redress its rights via a civil action, a litigant forswears any opportunity to consult law enforcement.  No authority exists that would impose such an either/or choice upon an aggrieved party.  And more specifically, to credit this aspect of the Motion, the Court would also have to find that there was some illegitimacy to any contact with the Attorney General's office—a finding for which there is no support and cannot be any support.

In support of their hypothesis of bad faith or harassment under the CCPA, Defendants last point to a discovery motion filed on May 22, 2012.  However, summary judgment on the CCPA claim was granted on April 26, 2012.  CM-ECF # 233.  The Motion in question was directed at Lanham Act false advertising in any event.  CM-ECF # 266 at p. 2 ("Mr. Casady is a United Airlines pilot from Harriman, Tennessee, who is a former customer of Defendant Armstrong Steel, and will testify about Defendants' false advertising").

### *Defendants' Requested Fees*

Counsel's narratives are not parsed according to the claims on which they prevailed.

Rather, Defendants have submitted virtually the entirety of counsel's work on the case for compensation, partially supplemented by sheets created after the fact that allocate rough percentages to specific claims.  And notwithstanding this after-the-fact parsing, the very first page includes work on "false advertising," on which Plaintiff prevailed.  CM-ECF # 357-11 p. 5 (Research false advertising).

Counsel Mr. Grant was putatively retained "for the sole purpose of assisting existing counsel in the defense of the CCPA claim."  MOTION at p. 19.  It is unclear why Defendants, if faced with a claim that is so clearly "groundless" as to warrant a CCPA fee award, required such specialized assistance.  And despite the explicitly limited scope of his engagement, Mr. Grant's work for which Defendants seek compensation includes broad tasks that run through trial of this matter—more than two months beyond summary judgment on the CCPA claim.  Put another way, the overall nature of his engagement and invoicing reflects not exclusive work on matters CCPA, but rather duplication of effort.  (Leyendecker & Lemire are requesting 425.71 hours for the CCPA claim—more than Mr. Grant's 413.9 hours even though Mr. Grant stayed on after summary judgment on the claim.)

Further, beyond the rough-and-ready after-the-fact parsing, the billing narratives themselves are excessive in relation to the tasks for which fee-shifting is sought.  Leyendecker & Lemire's Page 8 of 46 reflects 56.5 hours devoted to answering the Amended Complaint—a task which occurred well after counsel's initial investigation of the case, which initially resulted in a motion to dismiss.  Attorney time totaling 86.5 hours is invoiced for Defendants' 14-page motion to dismiss—*Id.* at pp. 6-7.  Still further, the Confidential Settlement Statement is the subject of 37 hours of time.  *Id.* at p. 18.  Written discovery responses are the subject of 111 hours of

invoicing.  Over 123 hours for jury instructions are submitted, including 8.8 for Mr. Grant.  *See*

**Exhibit 1.**

Review of Defendants' fee request also reveals that the after-the-fact attribution of

"compensable" percentages is an unreliable method by which to capture awardable fees, because

the specific entries for which compensation is sought are grossly outside the scope of the claims

in question.  Mr. Lemire's Affidavit and fee invoices purportedly supporting fees "related to

defense of the CCPA claim" show large blocks of fees plainly not related to defense of the

dismissed CCPA claim.  (CM-ECF #357-10).  At page 20, for example, the February 2011 time

entries are almost all for matters separate from the CCPA claim.  By way of further example, the

February 7 through February 22, 2011 time entries are almost all related to a discovery hearing,

reflecting around 50 hours billed to this discovery hearing.  The discovery hearing was brought

by Plaintiff to compel Defendants to produce their financial records.  A hearing was held on

February 23, 2011 and the Court compelled Defendants to produce requested financial records.

MINUTE ORDER dated 2/24/2011, CM-ECF #54.  Plaintiff sought discovery of Defendants'

financial records so it could obtain evidence to support a disgorgement of profits remedy.  The

Court ultimately entered a disgorgement award under Plaintiff's Lanham Act false advertising

claim.  CM-ECF #346.

On April 15, 2011, Defendants bill for 8.5 hours to complete a final revision of motion to

amend and prepare an email.  This relates to CM-ECF #57, a six page motion to amend the case

scheduling order filed by Defendants on that date.  How it took 8.5 hours to complete a final

revision of this document, or how it relates to the CCPA claim are mysteries, as is how 25% of

this entry relates to CCPA.

By way of further example, Defendants' time entries for July 7-15 identify approximately 30 hours billed for attorney Jacob Paul's work preparing a supplemental discovery response. This work was in regard to yet another discovery hearing and Minute Order (CM-ECF #78) on June 23, 2011, where Plaintiff's motion to compel supplemental discovery responses was granted and Defendants were ordered to supplement by July 14, 2011.  The 12-page supplemental response was served on July 14, 2011, and has no relation to CCPA.  In fact, most of the response relates to Plaintiff's efforts to obtain evidence that allegedly supported Defendants' tort counterclaims for interference with contract and/or business advantage.  Defendants came up with no evidence and the Court subsequently dismissed Defendants' counterclaims.  (Order dated April 26, 2012, CM-ECF #236).  Defendants, however, ask for 50% of this inordinate and grossly excessive 30 hours spent and/or billed to prepare a supplemental response to *seven* interrogatories.

On August 30, 2011, Defendants bill 11 hours for Jacob Paul to attend the deposition of General Steel CEO Jeffrey Knight.  (they charge only 25% of the time to CCPA).  Mr. Paul had no role in the deposition (Mr. Grant asked the questions for Defendants).  The deposition lasted from 9:35 a.m. to 4:59 p.m. – under 7.5 hours, yet 11 hours is billed for "J.Knight Depo." Mr. Grant billed 8 hours for taking this same deposition.

On March 9 and 12, 2012, Defendants bill for 12.75 hours relating to Plaintiff's motion to reopen discovery to take the deposition of Defendants' former sales manager, David Nardozzi. 100% of this time was credited by Defendants to CCPA—but again, Mr. Nardozzi was a trial witness.  Further, the Court's Minute Order dated March 9, 2012 (CM-ECF # 154) shows that that the deposition of Mr. Nardozzi was in regard to (1) alleged spoliation of evidence relating to

this lawsuit by Defendants; (2) alleged infringement of Plaintiff's trademark by Defendants, <u>and</u> (3) alleged false and misleading advertising by Defendants and alleged deceptive sales practices by Defendants during the time period 2009 to present.   At best, 1/3 of this time would be "CCPA" related, yet this underscores Defendants' absence of billing judgment.

In regard to time billed to the trademark claim, Mr. Lemire's affidavit indicates that on July 6, 2010, Jacob Paul billed 2.3 hours to draft entries of appearance.  On July 19, 2010, CM-ECF #'s 11 and 13 reflect entries of appearance for Messrs. Lemire and Paul.  They are one sentence each.

In sum, Defendants' invoices for associate attorney Jacob Paul's time attribute 685.65 hours to the Lanham Act claims (Lemire Aff. at ¶ 4, CM-ECF #357-11 at 2) and 418.52 hours to the CCPA claim (Lemire Aff. at ¶ 4, CM-ECF #357-10 at 2) for a grand total of <u>1104.17 hours of time allegedly spent by attorney Jacob Paul attributable to these two discrete claims</u>.  At best, the Motion reflects an extreme lack of billing judgment.

> Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended.  In determining what is a reasonable time in which to perform a given task, an attorney submitting billing entries should consider the following factors: (1) the complexity of the case; (2) the number of reasonable strategies pursued; (3) the responses necessitated by the maneuvering of the other side; and (4) "the potential duplication of services" caused by the presence of multiple attorneys when one would suffice. *Ramos*, 713 F.2d at 554.  A court should also take extra care to ensure that an attorney has not included unjustified charges in his billing statement.  Ultimately, the Court's goal is to  fix a fee that would be equivalent to what the attorney would reasonably bill for those same services in an open market and fees will be denied for excessive, redundant, and otherwise unnecessary expenses. *Ramos*, 713 F.2d at 553. The burden is on the party requesting fees to prove that its counsel exercised proper billing judgment.

*Peterson-Hooks v. First Integral Recovery, LLC,* 2013 U.S. Dist. LEXIS 73907, 23-25, 2013 WL 2295449 (D. Colo. May 24, 2013) (*citing Ramos v. Lamm,* 713 F.2d 546 (10th Cir. 1983)).

Defendants have failed to meet the *Ramos* criteria, most obviously as to the potential for duplication of services but also as to the other factors.  *See also Grynberg v. Ivanhoe Energy, Inc.,* 2011 U.S. Dist. LEXIS 83819, 20-21, 2011 WL 3294351 (D. Colo. Aug. 1, 2011) ("there was no compensable need for two competent law firms to represent the same clients").

### *Conclusion*

"Mr. Chumley was committed to damaging the reputation of General Steel."  CM-ECF # 346 at p. 10.  Plaintiff's efforts were devoted to opposing that commitment, and to protecting its interests in its own name and Mark.  Defendants won on some of their claims, but ultimately lost the case.  Defendants' Motion does not make the objective or subjective showings necessary for a defendant's fee award under either the Lanham Act or the Colorado Consumer Protection Act. The Motion should be denied in its entirety.  However, should the Court find any entitlement to fees, Plaintiff respectfully asks for leave to supplement this Response with an expert analysis of the fees Defendants have requested.  *See United States ex rel. Sun Constr. Co. v. Torix Gen. Contrs., LLC,* 2011 U.S. Dist. LEXIS 59699, 12-13 (D. Colo. June 6, 2011).

DATED:  June 14, 2013.                              Respectfully Submitted,

                                                                       /s/Patrick D. Frye
                                                                       David S. Fein, Reg. No. 18788
                                                                       Patrick D. Frye, Reg. No. 30369
                                                                       Building Services Group, LLC Legal Dept.
                                                                       10639 Bradford Road
                                                                       Littleton, CO 80127

                                                                       Attorneys for Plaintiff

15

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served via PACER this on the day of its filing upon the following:

Peter C. Lemire
Leyendecker & Lemire, LLC
5460 S. Quebec St., Suite 330
Greenwood Village, CO 80111
Peter@coloradoiplaw.com

Paul M. Grant
Grant Kuhn LLC
143 Union Blvd., Ste. 550
Lakewood, CO 80228
pgrant@grantkuhnllc.com

/s/ Adam Walczak